278 F.3d 971
 Joe HARPER, and the class of similarly situated persons; Alex Morrow, and the class of similarly situated persons; Jason McBride, and the class of similarly situated persons, Plaintiffs-Appellees,
v.
UNITED STATES SEAFOODS LP; Seafreeze Alaska F/V, Defendants-Appellants.
 No. 01-35264.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 5, 2001.
 Filed January 29, 2002.
 
 Anthony J. Gaspich (argued), Gaspich & Williams, P.L.L.C., Seattle, WA, for defendant-appellant United States Seafoods, L.P.
 George H. Luhrs, (argued), Seattle, WA, for plaintiffs-appellees Joe Harper and the class of similarly situated persons, et al.
 Jay H. Zulauf (argued), and Christopher S. McNulty, Mundt MacGregor, L.L.P., Seattle, WA, for defendant-intervenor F/T Seafreeze Alaska, and amicus curiae At-sea Processors Association.
 Appeal from the United States District Court for the Western District of Washington; Marsha J. Pechman, District Judge, presiding. D.C. No. CV-00-01610-MJP.
 Before: O'SCANNLAIN, GRABER, and McKEOWN, Circuit Judges.
 OPINION
 McKEOWN, Circuit Judge.
 
 
 1
 This case calls for us to decide whether an admiralty statute that requires the master of a fishing vessel to "make an ... agreement in writing" with each crew-member before a voyage also requires the master's signature on the agreement. 46 U.S.C. § 10601. Although the predecessor statute dates from the late 1770s, surprisingly, this is a question of first impression in the Ninth Circuit. The district court granted partial summary judgment in favor of a seaman who was employed under a contract that the master did not sign. The district court held that the contract was invalid because the statute required this signature. We agree and affirm.
 
 BACKGROUND
 
 2
 Defendant-Appellant United States Seafoods L.P. employed Plaintiff-Appellee Joe Harper on its fishing vessel Seafreeze Alaska in early 2000. The Seafreeze Alaska is a factory trawler that operates out of Alaska, in the Bering Sea. United States Seafoods hired Harper through its Seattle office, and its recruiting and hiring coordinator signed the employment contract on behalf of the company. It is undisputed that the vessel's master did not sign this contract.
 
 
 3
 Harper and two other crewmembers filed an action on behalf of themselves and a putative class against United States Seafoods L.P. in personam, and the F/T Seafreeze Alaska in rem (collectively, "U.S.Seafoods"), primarily claiming that their contracts were defective.[1] Harper moved for partial summary judgment on the issue of whether his contract was invalid under 46 U.S.C. § 10601. In a carefully considered order, the district court granted the motion, reasoning that the statute unambiguously required the master to sign. Order on Plaintiff's Motion for Partial Summary Judgment, Harper v. United States Seafoods, No. C00-1610P (W.D.Wa. Mar. 8, 2001). Because there was no evidence that the master had in any way participated in drafting the agreement, the court declined to consider whether the statute could be satisfied by some participation short of signing the agreement. The district court specifically declined to rule on "damages, if any." Id. at n. 2.
 
 JURISDICTION
 
 4
 We have jurisdiction in this interlocutory admiralty appeal pursuant to 28 U.S.C. § 1292(a)(3).[2] "Ordinarily, interlocutory orders are not appealable, but 28 U.S.C. § 1292(a)(3) `creates an exception to the final judgment rule for orders determining the rights and liabilities of the parties to admiralty cases.'" Royal Ins. Co. of Am. v. S.W. Marine, 194 F.3d 1009, 1013 n. 2 (9th Cir.1999) (quoting Kesselring v. F/T Arctic Hero, 30 F.3d 1123, 1125 (9th Cir.1994)).
 
 DISCUSSION
 
 5
 This case presents a pure question of statutory interpretation, which we review de novo. See Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir.2001). Following the direction of the Supreme Court in Duncan v. Walker, 533 U.S. 167, 121 S.Ct. 2120, 2124, 150 L.Ed.2d 251 (2001), we look first to the text of the statute, which is clear and unambiguous:
 
 
 6
 (a) Before proceeding on a voyage, the master or individual in charge of a fishing vessel, fish processing vessel, or fish tender vessel shall make an [sic] fishing agreement in writing with each seaman enployed [sic] on board if the vessel is —
 
 
 7
 (1) at least 20 gross tons as measured under section 14502 of this title, or an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title; and
 
 
 8
 (2) on a voyage from a port in the United States.
 
 
 9
 (b) The agreement shall be signed also by the owner of the vessel.
 
 
 10
 (c) The agreement shall —
 
 
 11
 (1) state the period of effectiveness of the agreement;
 
 
 12
 (2) include the terms of any wage, share, or other compensation arrangement peculiar to the fishery in which the vessel will be engaged during the period of the agreement; and
 
 
 13
 (3) include other agreed terms.
 
 
 14
 46 U.S.C. § 10601.
 
 
 15
 The unambiguous text of 46 U.S.C. § 10601, which is supported by its historical development, requires the master to sign the agreement. The written agreement is a two-way street. Where there is a valid agreement, wages are determined according to contract and the crewmembers have only six months within which to file suit on in rem claims. 46 U.S.C. § 10602. And, where there is no controlling written agreement, wages are based on a statutory formula: the higher of the amount agreed to or the highest rate of wages at the port where the seaman was engaged. 46 U.S.C. § 11107.
 
 
 16
 I. HISTORICAL BACKDROP OF WRITTEN CONTRACTS AND 46 U.S.C. § 10601
 
 
 17
 Statutory protection of the seafarer's right to a written contract dates back to one of the first acts of Congress, and 46 U.S.C. § 10601 descends from that venerable tradition. Seattle-First Nat'l Bank v. Conaway, 98 F.3d 1195, 1196 (9th Cir. 1996). In 1792, Congress provided that cod fishermen[3] would be entitled to a statutory share of the fishing vessel's proceeds "unless the skipper or master thereof shall, before he proceeds on any fishing voyage, make an agreement in writing or in print, with every fisherman employed therein ... which agreement shall be endorsed or countersigned by the owner." Act of 1792, ch. 6, § 4, 1 Stat. 229, 231. The legislation went on to provide "[t]hat where an agreement or contract shall be so made and signed," the vessel would be liable for six months to the fishermen for their share. Id. § 5. This protection was extended to mackerel fishermen in 1865, March 3, 1865 Extension Act, 13 Stat. 535, and the statute was codified as R.S. 4391 (1878). See Caffray v. The Cornelia M. Kingsland, 25 F. 856, 859 (S.D.N.Y.1885). This provision was then codified at 46 U.S.C. § 531, the immediate predecessor to § 10601. As amended over the years, § 531 read, just prior to its repeal in 1988:
 
 
 18
 The master of any vessel [in the cod or mackerel fisheries] ... shall, before proceeding on such fishing voyage, make an agreement in writing with every fisherman who may be employed therein.... Such agreement shall be indorsed or countersigned by the owner of such fishing vessel or his agent.
 
 
 19
 46 U.S.C. § 531.
 
 
 20
 Cases under the predecessor acts refer to the master's signature, suggesting that our interpretation of the successor statute, § 10601, is consistent with the historical interpretation. See e.g., United States v. Atkins, 24 F. Cas. 885, 887 (D.Mass.1856) (No. 14, 474) (noting that a "paper was signed by the master and fishermen and countersigned by the owner"); Crowell v. United States, 6 F. Cas. 912, 913 (C.C.D.Mass.1856) (No. 3447) (holding an agreement invalid because it was not "in writing or print, signed by the master, and countersigned by the owner"); Whalen v. The Silver Spring, 29 F. Cas. 852, 852 (D.Mass.1854) (No. 17,477) (noting valid agreements were "signed by the captain and three men"). The requirement of a master's signature was thus assumed in prior case law.
 
 
 21
 Section 10601, which updated the statute's language and extended its coverage beyond the cod and mackerel industry to all fishing vessels, was enacted as part of the Commercial Fishing Industry Vessel Safety Act of 1988, titled: "An Act to provide for the establishment of additional safety requirements for fishing industry vessels, and for other purposes." Pub.L. 100-424, 102 Stat. 1585. The only legislative history relates to safety and limitation of liability. H.R. Rep. 100-729, 1988 U.S.C.C.A.N. 2149. The history of this statute thus illustrates that the requirement of the master's signature was carried forward from the Second Congress.
 
 II. CONSTRUCTION OF 46 U.S.C. § 10601
 
 22
 We next turn to the text of § 10601 "to construe what Congress has enacted." Duncan, 121 S.Ct. at 2124. In a related context, we have previously held that this provision is "perfectly clear facially." Seattle-First Nat'l Bank, 98 F.3d at 1197. We again conclude that the plain text is controlling: "if the language of a statute is clear, we look no further than that language in determining the statute's meaning." Id. (citations and internal quotation marks omitted). The only exception would be for "absurd or impracticable consequences," id., which are not present here.
 
 
 23
 The requirement in § 10601(a) that the master and the seaman "make a[] fishing agreement in writing" facially requires both parties to sign the agreement. More generally, § 10601 requires that the fishing agreement contain certain substantive provisions. For example, the agreement must include "the period of effectiveness" and "the terms of any wage, share, or other compensation arrangement." 46 U.S.C. § 10601(c)(1) & (2). It is thus consistent to read § 10601(a) as imposing a concrete requirement that the master sign the agreement.
 
 
 24
 To "make" an agreement, at least as applied to a written contract, is to execute the agreement in due form. As the district court noted, the pertinent definition from Black's Law Dictionary is: "To legally perform, as by executing, signing, or delivering (a document) <to make a contract>." Black's Law Dictionary 967 (7th ed.1999). The most relevant definition in Webster's also supports a signature requirement, defining "make" as: "enact, establish ... to execute in an appropriate manner: draw up <ãwill> <ã deed of transfer>." Webster's Third New Int'l Dictionary (Unabridged) 1363 (1961). Making a written agreement is no different. Indeed, the parties agree that executing a contract requires signing it.
 
 
 25
 Our interpretation of this provision is bolstered in the statute's second paragraph, which requires that "[t]he agreement shall be signed also by the owner of the vessel." 46 U.S.C. § 10601(b).[4] Our analysis of plain meaning includes an examination of the "`language and design of the statute as a whole.'" Seldovia Native Ass'n v. Lujan, 904 F.2d 1335, 1341 (9th Cir.1990) (quoting K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). If possible, every word should be given effect. Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Here, to give the word "also" effect in subsection (b), we must conclude that subsection (a) imposes a signing requirement.
 
 
 26
 U.S. Seafoods argues that § 10601 should be construed to require only the fisherman's, and not the master's signature — in other words, that to "make an ... agreement in writing" the seaman must sign, but the master need not sign. To pick and choose who should sign results in a bizarre reading of the statute. The Supreme Court has rejected such strained constructions of statutes. See Reno v. Bossier Parish Sch. Bd., 528 U.S. 320, 329, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000).
 
 
 27
 Finally, we agree with the district court that, far from being absurd or impracticable, requiring the master or individual in charge to sign the agreement reasonably effectuates the purposes of § 10601. The statutory scheme was intended to protect the seafarer. Key Bank of Wash. v. S. Comfort, 106 F.3d 1441, 1443 (9th Cir.1997). Indeed, § 10601 is part of a subtitle of the code entitled "Merchant Seaman Protection and Relief." The seagoing master is the true "captain of the ship," while the owner generally controls the purse strings. It makes good sense for both parties to acknowledge and be bound by the terms of the crew member agreement.
 
 
 28
 U.S. Seafoods argues that "technical deficiencies" should not be considered a breach of the statute. Amicus At-sea Processors Association further develops this argument, urging the court to excuse a violation of § 10601 where there has been "substantial compliance."[5] Phrased either way, this argument does not avail U.S. Seafoods here.
 
 
 29
 The Supreme Court has counseled that courts are not free to rewrite admiralty laws simply because the result seems unfair in a particular case. In Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 565-66, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), the Supreme Court strictly interpreted a related admiralty statute, 46 U.S.C. § 596, "which requires certain masters and vessel owners to pay seamen promptly ... and authorizes seamen to recover double wages" for delayed payment. Griffin overturned circuit precedent allowing the district court to exercise discretion in imposing statutory damages for late payment of wages. The Court reasoned that the statutory per day penalty was consistent with Congress' protective purpose to avoid delay in paying seamen their wages, and that changing harsh results of literal application of the statute was a job for the legislature, not the courts. Id. at 572-75, 102 S.Ct. 3245. The same is true here.
 
 
 30
 U.S. Seafoods relies primarily on a Sixth Circuit case, which involved a merchant seaman's seasonal employment agreement that did not contain certain terms required under 46 U.S.C. § 10502 and its predecessor. See Sylvis v. Rouge Steel Co., 873 F.2d 122, 125 (6th Cir.1989). The court relied heavily on a collective bargaining agreement that contained "explicit provisions governing seamen's compensation," reasoning that, combined with the seasonal employment agreement, the agreements satisfied "the intent, if not the letter" of the admiralty statutes. Id. at 126.
 
 
 31
 We are not persuaded that Sylvis is consistent with the teaching of Griffin. Sylvis is also distinguishable. Not only was Sylvis decided under a different statute, it involved a separate collective bargaining agreement. Cf. Gardiner v. Sea-Land Serv., Inc., 786 F.2d 943 (9th Cir. 1986) (upholding collective bargaining agreement specification of maintenance pay, although less than judicially defined minimum amount).
 
 
 32
 We do not hold that substantial compliance analysis would never be appropriate under this statute. This is not a case in which the master assented to the agreement by means other than an original signature on a paper contract — by electronic mail, or (at the other extreme) by having hand-written the contract in the seafarer's presence, for example. We hold only that under the circumstances here, where the master did nothing even arguably equivalent to signing the contract, the requirements of § 11601 have not been met.
 
 
 33
 We are not unmindful of concerns that adherence to the statutory mandate may lead to litigation of contracts that were otherwise assumed valid. U.S. Seafoods argues that "penalty wages" will apply if the contract is held invalid. It is true that a seaman employed "contrary to a law of the United States" is entitled to "the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher." 46 U.S.C. § 11107. We note, however, that although we have sometimes characterized § 11107 as imposing a penalty, see, e.g., Seattle-First Nat'l Bank, 98 F.3d at 1198, it is perhaps better characterized as merely providing a statutory default to prevailing market wage in the case of an invalid contract. Thus, we have held that the wages must be computed with respect to the seaman's actual rate, not the highest possible rate on the ship. TCW Special Credits v. Chloe Z Fishing Co., 129 F.3d 1330, 1334 (9th Cir.1997). We therefore decline to alter our interpretation of the clear meaning of § 10601 based on the ramifications of § 11107. We do not reach the question of the applicability of § 11107, because the district court specifically reserved the issue of damages.
 
 
 34
 As we have explained in previous cases, the statutory scheme also benefits the vigilant employer. See Key Bank of Wash., 106 F.3d at 1443; Seattle-First Nat'l Bank, 98 F.3d at 1198-99. A fishing vessel that complies with the statutory requirements is protected by a six-month statute of limitations on in rem claims. 46 U.S.C. § 10602. This benefit is the quid pro quo for giving the seafarer a written contract. We are thus persuaded that giving § 10601 its most straightforward interpretation, requiring the master to sign, is consistent with the overall design and purpose of the statutory scheme.
 
 III. ANALYSIS OF OTHER ADMIRALTY STATUTES
 
 35
 We are not persuaded by U.S. Seafoods' effort to resuscitate the contract through reference to related admiralty provisions that contain more explicit text directing the master to sign.[6] See 46 U.S.C. §§ 10302, 10305 and 10502. These statutes require written shipping agreements for other types of seamen. As an initial matter, we note that these statutes are not particularly instructive because there is no evidence that Congress intended us to harmonize or cross-reference the statutes. See U.S. West Communications, Inc. v. Hamilton, 224 F.3d 1049, 1053 (9th Cir.2000) (as amended) (citing Erlenbaugh v. United States, 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972), which stated that duty to harmonize is strongest for statutes passed within the same Act); United States v. Granderson, 511 U.S. 39, 51, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (holding that discrete, differently worded probation and supervised release provisions should not be interpreted in pari materia). To the extent these statutes may be fairly considered in construing § 10601, we think that they tend to support, not undermine, the interpretation that to "make an ... agreement in writing" both parties must sign.
 
 
 36
 Sections 10302 and 10305 do not cast doubt on our interpretation of § 10601. These statutes detail agreement requirements for non-fishermen merchant seamen, on U.S.-to-foreign voyages, mandating that the "owner, charterer, managing operator, master, or individual in charge shall make a shipping agreement in writing with each seaman before the seaman commences employment." 46 U.S.C. § 10302(a); see also 46 U.S.C. §§ 10301, 10303(c). In 1872, Congress created shipping commissioners with responsibility for looking after merchant seamen, and, in 1873, amended the shipping agreement provisions to require signature in the presence of the shipping commissioner. United States v. The Grace Lothrop, 95 U.S. 527, 530, 24 L.Ed. 514 (1877). A 1993 amendment changed "shipping commissioner" to "master or individual in charge." Pub.L. 103-206 § 403.
 
 The statute now provides:
 
 37
 The agreement required by section 10302 of this title shall be signed —
 
 
 38
 (1) first by the master and dated at that time, after which each seaman shall sign; and
 
 
 39
 (2) in the presence of the master or individual in charge.
 
 
 40
 46 U.S.C. § 10305. Given its history, this provision is best understood as an elaboration of the manner in which the agreement is to be signed, not the addition of a signature requirement to a provision that otherwise would not require it.
 
 
 41
 U.S. Seafoods' argument with respect to § 10502 is similarly unavailing. Section 10502, which protects seamen on coastwise voyages, mandates: "The owner, charterer, managing operator, master, or individual in charge shall make a shipping agreement in writing with each seaman before the seaman commences employment." 46 U.S.C. § 10502(a). It goes on to state, in the same section, that "[e]ach shipping agreement must be signed by the master or individual in charge or a representative of the owner, charterer, or managing operator, and by each seaman employed." 46 U.S.C. § 10502(d). This section is best understood as a clarification of the disjunctive list in § 10502(a), allowing any one of the listed parties to sign. Section 10601, in contrast, requires both the master's and "also" the owner's signature. The related statutes, if anything, show a congressional understanding that making a written agreement in this context involves signing it. The requirements of each statute must, however, be interpreted independently.
 
 CONCLUSION
 
 42
 In an age of digital communications, the requirement that the contract bear the signature of both the master and the owner is neither unwieldy nor unworkable. Ships are no longer confined to the now-abandoned Morse code or ship-to-shore telephones. Electronic communication is readily available both on land and at sea. With the strictures of the statute in mind, we are confident that lawyers and shipping executives can easily craft a form of contract that complies with § 10601.
 
 
 43
 The judgment of the district court is AFFIRMED, and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The parties dispute whether the action also raises questions about whether Harper and the other crewmembers were fairly paid under the contract. It is unnecessary for us to resolve these issues because of the narrow scope of this appeal
 
 
 [2]
 All remaining motions, including the motion for class certification, were stayed pending resolution of the appeal
 
 
 [3]
 The requirement of a written contract for merchant seamen, as distinguished from fishermen, dates from 1790 and the First Congress Act of 1790, ch. 29, § 1, 1 Stat. 131
 
 
 [4]
 We do not address Harper's argument, which is raised for the first time on appeal, that the contract also failed in this owner signature requirement. U.S. Seafoods appears to have used a standard form contract between the seafarer and the "employer," which was apparently also the owner here. On its face the contract does not include a signatory with an owner designation. Whether the employer is also the owner is, of course, a question of fact. Nonetheless, we note that to avoid ambiguity, the form could simply include a signature line for the owner or designate the company/employer as the owner if that is the true relationship
 
 
 [5]
 The Ninth Circuit has frequently rejected substantial compliance argumentsSee, e.g., Long v. Coast Resorts, Inc., 267 F.3d 918, 921-23 (9th Cir.2001) (Americans with Disabilities Act); S. Cal. Gas Co. v. Util. Workers Union of Am., Local 132, 265 F.3d 787, 795-96 (9th Cir.2001) (Department of Transportation regulations); Bowlin & Son, Inc. v. San Joaquin Food Serv., Inc. (In re San Joaquin Food Serv., Inc.), 958 F.2d 938, 940-41 (9th Cir.1992) (Perishable Agricultural Commodities Act). But see United States v. Nielsen, 1 F.3d 855, 858 (9th Cir.1993) (applying substantial compliance analysis to statute on right to juror information).
 
 
 [6]
 U.S. Seafoods also attempts to find support in the 1792 statute, which refers to the agreement as "so made and signed." Act of 1792, ch. 6, § 5, 1 Stat. 229, 231. Contrary to U.S. Seafoods' interpretation, we read this phrase to underscore Congress' understanding that the master would sign the written contract