**Elias FLORES, Jose Toledo, and the class of similarly situated persons who worked aboard the factory trawlers Ocean Rover, American Triumph, Northern Eagle, Northern Hawk, Northern Jaeger, and Katie Ann, Plaintiffs–Appellants,**

**v.**

**AMERICAN SEAFOODS COMPANY; American Seafoods Company LLC; Ocean Rover F/T; American Triumph F/T; Northern Eagle F/T; Northern Hawk F/T; Northern Jaeger F/T; Katie Ann F/T, their engines, tackle, equipment, appurtenances, freights, and cargo, In Rem, Defendants–Appellees.**

**Elias Flores, Jose Toledo, and the class of similarly situated persons who worked aboard the factory trawlers Ocean Rover, American Triumph, Northern Eagle, Northern Hawk, Northern Jaeger, and Katie Ann, Plaintiffs–Appellees,**

**v.**

**American Seafoods Company and American Seafoods Company LLC, Defendants–Appellants,**

Ocean Rover F/T; American Triumph F/T; Northern Eagle F/T; Northern Hawk F/T; Northern Jaeger F/T; Katie Ann F/T, their engines, tackle, equipment, appurtenances, freights, and cargo, In Rem, Defendants–Appellees.

Elias Flores, Jose Toledo, and the class of similarly situated persons who worked aboard the factory trawlers Ocean Rover, American Triumph, Northern Eagle, Northern Hawk, Northern Jaeger, and Katie Ann, Plaintiffs–Appellees,

v.

American Seafoods Company and American Seafoods Company LLC, Defendants–Appellants,

Ocean Rover F/T; American Triumph F/T; Northern Eagle F/T; Northern Hawk F/T; Northern Jaeger F/T; Katie Ann F/T, their engines, tackle, equipment, appurtenances, freights, and cargo, In Rem, Defendants–Appellees.

Nos. 02–35150, 02–35195 and 02–35526.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 2003.

Filed July 9, 2003.

Bradley H. Bagshaw, Helsell Fetterman LLP, Seattle, WA, for the plaintiffs-appellants-cross-appellees.

Jay H. Zulauf, Hall Zanzig Zulauf Claflin & McEachern, PLLC, Seattle, Washington, and J. David Stahl and Christopher S. McNulty, Mundt MacGregor LLP, Seattle, Washington, for the defendants-appellees-cross-appellants.

Before: O'SCANNLAIN, GOULD, Circuit Judges, and BOLTON,* District Judge.

GOULD, Circuit Judge.

In this case we must clarify the requirements of a federal maritime statute whose origins date back to the late eighteenth century. When enacted in 1792, the requirement that a fishing agreement must be "in writing" applied only to seamen fishing for cod. Congress has gradually broadened the scope of this requirement, and it no longer includes any limitation based on the kind of fish that the seamen catch. When the events occurred that gave rise to this litigation, the applicable statute, 46 U.S.C. § 10601(a) (2000), provided simply that a "fishing agreement" must be "in writing" if the fishing vessel met other statutory requirements that are not in dispute here. The fishing agreement also had to be signed by both the "master or individual in charge of [the] fishing vessel," pursuant to 46 U.S.C. § 10601(a) (2000), and by "the owner of the vessel," pursuant to 46 U.S.C. § 10601(b) (2000).[1] These statutory requirements are intended to protect seamen and to ensure they have a clear and enforceable written commitment defining the consideration for which they risk their life at sea. The questions of statutory interpretation raised here are (1) whether the fishing agreement was "in writing" when a provision for bonus was explained orally, and (2) whether the vessel masters satisfied the signature requirement by delegat-

---

* The Honorable Susan R. Bolton, United States District Court Judge for the District of Arizona, sitting by designation.

1. In 2002, the separate provisions concerning the signatures of the owner and the vessel master were combined and revised. Section 10601(a) now provides that

 [b]efore proceeding on a voyage, the owner, charterer, or managing operator, or a rep-

resentative thereof, including the master or individual in charge, of a fishing vessel, fish processing vessel, or fish tender vessel shall make a fishing agreement in writing with each seaman employed on board.

The change does not affect the parties' dispute.

ing to an agent the authority to sign on their behalf.

## I

Elias Flores and Jose Toledo ("appellants") are members of a class initially composed of 732 crew members who worked on ships owned by American Seafoods Company ("ASC") from January to April, 2000.[2] On January 11, 2000, shortly before setting out for the Bering Sea ground fisheries within the Exclusive Economic Zone off the coast of Alaska, the seamen signed employment contracts with ASC for the upcoming season at orientation meetings in Seattle. Cathy Udoff ("Udoff"), an ASC Human Relations official, signed for both ASC and the vessel masters. The vessel masters had completed a form delegating to Udoff the authority to sign on their behalf.

The contracts were signed at mass meetings where Udoff explained the terms of the contracts. 477 of the crew members, including the appellants, were hired as processors[3] with the same form contract. The contractual section on compensation specified that each processor would receive three shares from the "crew share pool," whose value would be calculated by taking the number of fish caught and multiplying that figure by the "posted price" of the fish, which ASC would establish in advance with a "good faith estimate." The crew members were hired to work on six trawlers—five fished for pollock, and one fished for cod. The contracts provided that on the cod-fishing ship, the "crew share pool" was 28% of the total value of the harvest for the season, while on the pollock-fishing ships, the "crew share pool" was 21% of the harvest. The processors' contracts were otherwise identical.

The contracts stated that "[p]erformance bonuses may be awarded to processors based on factors identified on Crew Members' performance evaluation at the Employer's sole discretion. Employer makes no guarantee or promise of compensation to Crew Member other than [the three crew shares]." In explaining this provision orally at the orientation meetings, Udoff set out a formula showing how the processors' performance ratings, expressed as a total of ten factors on the evaluations, would be measured to produce a scaled number[4] of shares in the "bonus pool" at the end of the fishing season. The corresponding number of "bonus shares" ranged from zero for poor performers to four for excellent performers. The method of distributing those shares was described on a handout. In essence, all of the processors' "bonus shares" were added to determine the total number of shares in the "bonus pool," and the value of a single share was equal to the total value of the pool divided by the number of shares in the pool. Because these calculations could be performed only after all performance evaluations were completed at the end of the season, neither the number of "bonus shares" in the pool nor the value of a single share could be determined until then. Udoff also described a

---

**2.** There are now fewer members in the class because 66 seamen have opted out.

**3.** We use the term "processors" throughout this opinion to mean the ASC employees who processed fish.

**4.** By a "scaled" number, we mean a number that has been converted from one range or system of measurement (usually a "raw"

number) to another. The term is often used in ability tests. *See, e.g., Atkins v. Virginia,* 536 U.S. 304, 309 n. 5, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ("The [Wechsler Adult Intelligence Scales test] is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score.").

forfeiture provision under which bonuses would be available only to those processors who worked for the entire season; any processor who left during the season would not be eligible for a bonus.

In addition to explaining how the bonus shares would be calculated, Udoff explained, albeit incompletely, how the "bonus pool" would be funded. It was assigned a value equal to a certain portion of the "crew share pool"; the portion was to be calculated with a formula that was spelled out on the handouts, and the details of which are not in dispute. What is in dispute is whether the funds allocated to the "bonus pool" were to be subtracted from the funds in the "crew share pool," or whether the "bonus pool" would be independent of the "crew share pool." Udoff did not clearly explain this feature. The written contract makes no mention of a "bonus pool." The only discussion of share value in the written contract appears in a provision stating that "[t]he value of one share [of the crew share pool] is calculated by totaling the number of shares assigned to Crew Members working at the start of the trip and dividing that sum into the crew share pool. The crew share pool is equal to twenty one percent (21%) of the value of each trip.... When vessels [fish for cod,] the crew share pool will be equal to 28% of the value of each trip." ASC interpreted this provision to mean that all funds allocated to seamen were to come from the "crew share pool," so that the seamen's total income for the season was capped at 21% of the harvest for the pollock-fishing ships, and 28% of the harvest for the cod-fishing ship. It appears that altogether, ASC paid the seamen about $16.3 million at the end of the season, on the basis of this interpretation of the contract. The appellants, however, argue that this provision pertains only to the value of the "crew share pool," and that the contract defines this pool in a way that excludes the "bonus shares," which would then be awarded over and above the 21% or 28% cap on the "crew share pool."

In April 2000, soon after returning to Seattle from the Bering Sea, the appellants filed suit against ASC in district court, arguing that because of the oral explanation of the bonus provision, the contracts were not "in writing" as required by section 10601(a). The appellants also argued that because the vessel masters had delegated the signing of the contracts to an agent, the contracts were not signed by the vessel masters, as required by section 10601(a). In addition, the appellants raised two claims alleging breach of contract. First, the appellants argued that ASC breached the contract by funding the "bonus pool" as a subset of the "crew share pool" rather than allocating 21% (or 28%) of the harvest to the "crew share pool" and funding the "bonus pool" separately. Second, the appellants argued that ASC had underpaid them by failing to make a "good-faith estimate" when posting the price for pollock roe for one of the trips during the season. About six weeks after the suit was filed, ASC gave the seamen a $2.725 million post-season adjustment to reflect the difference between the price realized at market and the "posted price" estimated for the pollock roe.

At trial, the district court found that ASC "breached its contract obligation to estimate roe prices in good faith," but the court concluded that the crew members "suffered no damage for [the] breach of contract" because of the post-season adjustment that ASC paid out. The district court rejected the appellants' claims under 46 U.S.C. § 10601(a), reasoning that the vessel masters satisfied the signature requirement when they delegated to an agent the authority to sign on their behalf, and that the fishing agreements were "in writing." However, the district court

agreed with the appellants' argument that contract required the "bonus pool" to be funded separately from the "crew share pool." The district court awarded about $1.8 million in damages and prejudgment interest on that claim.

The appellants also sought attorneys' fees and expanded litigation costs pursuant to Wash. Rev.Code § 49.48.030.[5] The choice-of-law clause in the fishing agreement provided that "[t]his Agreement shall be governed exclusively by the general maritime laws of the United States and applicable United States Statutes," and that the "obligations, rights and remedies with respect to the employment relationship established by this Agreement ... shall not be enlarged, supplemented or modified by the laws of any State or local jurisdiction." Federal maritime law makes no provision for attorneys' fees. The district court ruled that the seamen's rights to attorneys' fees "are important public rights that cannot be waived" by ASC's provision that the contract would be governed by federal maritime law. The district court also found that "these state law provisions [awarding attorneys' fees to the prevailing party in a wage dispute] are not preempted under federal law." The court awarded the appellants $339,651 in attorneys' fees and $43,583 in expanded costs pursuant to the Washington statute.

The appellants appeal the district court's determinations that neither the vessel masters' delegation of the signature requirement nor the oral explanation of the bonus awards violated section 10601(a). ASC cross-appeals, challenging the district court's award of attorneys' fees and the district court's interpretation of the contract to require that the "bonus pool" be

funded separately rather than as a subset of the "crew share pool."

## II

■ We begin with the contracts' provisions regarding the two pools of funds. The interpretation and meaning of contract provisions are questions of law reviewed de novo. *Yu v. Albany Ins. Co.,* 281 F.3d 803, 807 n. 2 (9th Cir.2002). Because the contracts' choice-of-law clause provided that federal maritime law would govern, we apply federal common law in interpreting the contracts. Under federal law,

[a] written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. Whenever possible, the plain language of the contract should be considered first.

*Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1210 (9th Cir. 1999) (citations omitted).

■ Bearing these principles in mind, we turn to the provision on "crew share" value. The district court correctly interpreted this provision with reference to the contract as a whole. As the district court explained, "the contract provisions regarding bonus shares did not fully explain the ... bonus system." The district court said that the provision on "crew share" value "is not ambiguous" and that it must be understood as "excluding any shares for the Performance Bonus."

**5.** That statute provides, in relevant part:
 In any action in which any person is successful in recovering judgment for wages or salary owed to him, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer.

In examining the language of the disputed provision, the district court correctly said that ASC's treatment of the "crew share pool" involved "compensation to be paid to the crew *before* any discretionary bonus." (emphasis added). We again quote the language of the contract:

The value of one share [of the crew share pool] is calculated by totaling the number of shares assigned to Crew Members working at the start of the trip and dividing that sum into the crew share pool.

This provision contemplates a pool consisting only of "shares assigned to Crew Members working at the start of the trip." The "bonus pool," which was not mentioned anywhere in the written contract, included no such shares. The funds in the "bonus pool" were to be distributed at ASC's discretion at the end of the season, in the form of shares whose number would be determined at that time, based on the processors' final performance scores. Such shares could not have been "assigned to Crew Members working at the start of [a] trip," since it could not be known how many bonus shares there were, and to whom they would be assigned, until the season was over.

ASC argues that it showed that the "bonus pool" was a subset of the "crew share pool," and to support this argument, ASC points to the district court's statement that "[d]uring the orientation meetings ... ASC representatives told the processors that the bonus shares would be added to the base-wage shares to determine the total assigned shares." This argument does not persuade us. In context, it appears the district court meant simply that ASC *tried* to explain that the "bonus shares" were included in the "total assigned shares." In the very same paragraph, the district court stated its finding that "even [ASC's own handout on bonus shares] nowhere says shares in both [pools] will be added together to obtain the 'total assigned shares' referred to in the contracts." The district court also found that the fishing agreements "do not expressly disclose that the bonus shares would be added to the base crew share before determining the wages to be paid," and that ASC's production reports "provide ... evidence that the bonus shares were treated differently than the crew shares." To the extent that the statement now quoted by ASC could be regarded as a finding that ASC showed that the two pools were merged, such a finding would conflict with the evidence as a whole, as well as with the district court's express findings to the contrary, and would be erroneous.

ASC also argues that Udoff's testimony in district court supports ASC's view of the contract. Udoff testified about what she told the seamen when explaining the provision on "crew share" value quoted above. She said, "I would read this sentence, and then I would explain to [the seamen] that the way you find out how many crew shares on board are assigned is that you would take the total of all the key crew crew shares and all of the processor crew crew shares, and the crew—the shares that are set aside for the processor bonus pool, you add all those up, and that will tell you the number of shares assigned to that vessel." Udoff's explanation was unclear. She spoke of "shares assigned to [a] vessel," not "shares assigned to crew members working at the start of [a] trip." Udoff did not track the language of the contract. Udoff's explanation at the orientation meetings did nothing to change the objective meaning of this provision. Even after hearing Udoff's explanation, the district court concluded that the crew members had every reason to believe that the "bonus pool" would be funded separately.

ASC contends that "shares assigned to Crew Members working at the start of the trip" must be interpreted to mean "shares assigned collectively to Crew Members at any time during the season." That reading would involve considerable revision of the language in the contract, requiring us to remove some words and to add others that contradict the terms of the agreement. The plain language of the contract shows that the "bonus pool" was to be funded separately from the "crew share pool," so that the 21% (or 28%) share allocated to the latter did not include the "bonus pool." We affirm the district court's ruling that the contract created two separate pools, and that ASC breached the contract by failing to fund them separately.

## III

■ We turn next to 46 U.S.C. § 10601(a), which requires expressly that a seaman's fishing agreement be "in writing" and be signed by the vessel master. An agreement that violates either of these requirements will trigger the application of 46 U.S.C. § 11107, which provides that

[a]n engagement of a seaman contrary to a law of the United States is void. A seaman so engaged may leave the service of the vessel at any time and is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher.

We have said that section 11107 "provid[es] a statutory default to prevailing market wage in the case of an invalid contract." *Harper v. United States Seafoods LP,* 278 F.3d 971, 977 (9th Cir.2002).

### A

The appellants first argue that the contracts were invalid on their face, on the theory that the bonus provisions rendered the contracts illusory. An illusory promise is one containing words "in promissory form that promise nothing" and which "do not purport to put any limitation on the freedom of the alleged promisor." 2 Corbin on Contracts 142 (rev.ed.1995). The appellants contend that because the bonus was discretionary, ASC could deny a bonus to any seaman without giving a reason. The bonus accounted for about one-third of the processors' pay, and so the appellants reason that if that income could be awarded or withheld at ASC's discretion, the contract was illusory.

■ "[I]n construing any contract, we favor a construction under which the agreement is legally valid over an interpretation which would require voiding the agreement." *United States v. Franco–Lopez,* 312 F.3d 984, 991 (9th Cir.2002). The handout that Udoff distributed at the orientation meetings showed how the value of the "bonus pool" would be determined and how the seamen's performance ratings would be used in awarding bonus shares. The handout gave sample earnings figures, showing what the seamen's income "would be" on the basis of hypothetical "bonus pool" values and performance ratings. As noted above, the formula for awarding "bonus shares" required ASC to sum up the processors' scaled performance scores and to divide the entire "bonus pool" by that sum. The formula, along with the accompanying figures on the handout and Udoff's explanation, showed that all of the funds in the "bonus pool" were to be distributed to the processors, all of whom would receive some share except for those whose performance ratings yielded a scaled score of zero. Under the formula, even if only a few processors received scaled scores higher than zero, that would not affect ASC's obligation to pay out the entire "bonus pool"; rather, it would mean

that those processors would receive large bonus awards.

■ The agreement was legally valid. While ASC retained discretion over how it would conduct performance evaluations and how it would assign performance ratings, ASC was required by the terms of its bargain with the seamen to award all of the bonus funds to the processors who were eligible for those funds, on the basis of performance ratings that were assigned reasonably and in good faith. *See, e.g., Livingstone v. N. Belle Vernon Borough,* 91 F.3d 515, 526 n. 11 (3d Cir.1996) (discussing the "duty of good faith and fair dealing" imposed under the federal common law of contracts); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). We agree with the Third Circuit, and with the general rule of the Restatement, that under federal contract law, at least in the context of admiralty law governing a seaman's rights and remedies, each contract carries with it a duty of each party to act in good faith and to deal fairly in performing and enforcing the contract. In light of this rule, it follows that the promise to give a discretionary bonus here was not illusory under federal contract law. *See, e.g., Milenbach v. Comm'r,* 318 F.3d 924, 930 (9th Cir.2003) (applying analogous California law on the requirement of good faith and fair dealing to hold that "[a]n obligation under a contract is not illusory if the obligated party's discretion must be exercised with reasonableness or good faith."). That ASC retained discretion over how to rate the individual processors' performances did not render the contracts illusory.

**B**

■ The appellants next argue that, even if not illusory, the contracts were invalid under 46 U.S.C. § 10601(a), on the theory that they were not "in writing." Despite the long-established rule that certain kinds of fishing agreements must be "in writing," there is no precedent from the Supreme Court or in our circuit addressing whether a fishing agreement is not "in writing" if any part of it is explained orally.

Section 10601(a) at a minimum invalidates a fishing agreement if there is no written contract at all. *See Seattle–First Nat'l Bank v. Conaway,* 98 F.3d 1195, 1198 (9th Cir.1996) ("Section 10601(a) requires that agreements with seamen be in writing; a master who hires a seaman on an oral contract violates that law. Therefore, the seaman is entitled to the remedies set forth in § 11107."). In explaining why a written agreement is required, *Seattle–First* said that the provision is meant to confer "protection of seamen from the duress, coercion, or deception that might result if masters were permitted to ship them out to sea without first providing written articles." *Id.* at 1199 n. 2 (9th Cir.1996).

Here, the written contract stated that the bonuses would be awarded at ASC's discretion, and Udoff orally explained how the processors' performance scores, determined at ASC's discretion, would be translated into "bonus shares." Udoff's explanation of the procedure for funding the "bonus pool" and awarding the "bonus shares" raised no issues of duress, coercion, or deception. As the district court correctly concluded, "[t]hat ASC did not spell out in more comprehensive written detail the policies by which it awarded the discretionary processor performance bonuses does not render ASC's fishing agreements with its processors void for purposes of § 10601." That conclusion was supported by the district court's finding that while ASC was "careless," it was

not "willful" when it "[did] not adequately explain[ ] the bonus pool system to the crew members."

To have any significance, the appellants' argument that the oral explanation violated section 10601(a) must logically be based on what Udoff said about how the "bonus shares" would be awarded or how the "bonus pool" would be funded, and must raise some material issue on either score. As for how the shares were to be awarded, the appellants argue that both the formula described by Udoff for calculating the bonus and the forfeiture provision she described (requiring completion of the season) should have been in writing, but the appellants do not assert that ASC acted unscrupulously or unreasonably in adopting either of these policies or that these terms, once explained, were ambiguous. While Udoff could have explained more clearly how the pool was to be funded, the district court was able to resolve that problem by giving the appellant processors an award equal to what they would have been paid under their interpretation of the contract, with the bonus funded apart from the specified "crew shares." The district court concluded that because the appellants could be adequately compensated by that adjustment, which amounted to an 11% increase in wages, it was not necessary to void the entire contract and to substitute the alternative provision of 46 U.S.C. § 11107. According to the appellants' calculations, that provision would have nearly doubled their wages. Whether or not the parties would have benefitted in some sense if the bonus provision had been written out in fuller detail, federal maritime law does not require this so long as ASC was not coercive or deceptive when explaining the factors that would go into the calculation of a bonus award. As the trial court found, the basic terms of a discretionary bonus were specified and ASC's failure to spell out all the details in writing was not deceptive.

The district court's analysis is consistent with the governing statute as well as basic principles of contract law, which would give damages where one party erred about the meaning of a provision, but would not void the entire contract unless the other party was aware of the mistake or the mistake rendered the contract unconscionable. *See* Restatement (Second) of Contracts § 153 (1981) (discussing unilateral mistake); *see also* Restatement (Second) of Contracts § 20 cmt. b (1981) ("Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy."). Here, by accepting the appellants' interpretation of the contract and awarding the funds due under that interpretation, the district court fashioned an appropriate legal remedy.

 Where a fishing agreement includes both written and oral provisions, it would be proper to void the agreement under section 10601(a) only if the oral terms were imposed under duress, or involved the kind of coercion or deception that section 10601(a) is designed to prevent. For example, *Crowell v. United States*, 6 F. Cas. 912, 913 (C.C.D.Mass. 1856), held that a fishing agreement was not "in writing," and therefore violated a precursor to section 10601(a), where the agreement "was not wholly in writing" because "in one material particular the actual agreement rested in parol." In *Crowell*, the written contract provided that each seaman was to receive a share of the catch, but under an oral agreement, the seamen were to receive, for each fish, a fixed sum set in advance and not based on the market price. The court voided the contract

because the oral agreement, which went to the basis for calculating the seamen's income, was "materially different" from the written agreement and purported to set aside the written terms, with the result that the seamen were "deprived of [the] advantage" of receiving a share of what the fish would bring at market. 6 F. Cas. at 913. Unlike the oral agreement in *Crowell*, ASC's oral explanation of the bonuses did nothing that purported to alter any of ASC's obligations in the written contract. We hold that ASC's oral explanation of bonus provision in the written contract did not violate section 10601(a).

**C**

█ The appellants' second basis for alleging a violation of section 10601(a) involves that provision's requirement that "the master or individual in charge[ ] of a fishing vessel[ ] . . . shall make [a] fishing agreement with each seaman e[m]ployed on board." We have said that "[t]he unambiguous text of 46 U.S.C. § 10601, which is supported by its historical development, requires the master to sign the agreement." *Harper*, 278 F.3d at 973–74. Here, the appellants argue that this requirement was not satisfied because the vessel masters delegated to Udoff the authority to sign the contracts. When the contracts were signed, the version of section 10601(b) that was in force provided that the fishing agreement "shall be signed also by the owner of the vessel." [6] The appellants argue that because the statutory scheme required the signatures of both the vessel master and the vessel owner, the statute's purpose was frustrated when Udoff signed on behalf of ASC and the individual vessel masters.

*Harper* held that the fishing agreements were void, and the wage provisions of section 11107 applied, where the vessel master did not sign the agreement at all. *Harper*, 278 F.3d at 975–76. In analyzing the statutory violation there, we said,

> We do not hold that substantial compliance analysis would never be appropriate under [46 U.S.C. § 10601(a) ]. This is not a case in which the master assented to the agreement by means other than an original signature on a paper contract—by electronic mail, or (at the other extreme) by having handwritten the contract in the seafarer's presence, for example. We hold only that . . . where the master did nothing even arguably equivalent to signing the contract, the requirements of [§ 10601(a) ] have not been met.

*Id.* at 977. *Harper* expressed no view on whether delegation of the signing is permissible. Whereas the vessel *master* "did nothing even arguably equivalent to signing the contract," the vessel *owner* in *Harper* had delegated that task to a hiring coordinator. However, we declined to address whether such delegation violated section 10601(a), because the seamen's objection to that procedure was raised for the first time on appeal. *See id.* at 975 n. 4.

There is no basis for the appellants' argument that the purpose of section 10601(a) is frustrated by permitting a delegate to sign for the vessel's owner or master. As we have noted, this provision was intended to protect seamen from duress, coercion, and deception. Here, such delegation could not have prevented any

---

**6.** As noted above, *supra* note 1, section 10601 was amended in 2002. Subsections (a) and (b) have been revised and consolidated into subsection (a), which now provides that "the owner, charterer, or managing operator, or a representative thereof, including the master or individual in charge, of a fishing vessel, fish processing vessel, or fish tender vessel shall make a fishing agreement in writing." 46 U.S.C. § 10601(a) (2002).

potential liability. *See, e.g., Whitney v. Wyman,* 101 U.S. 392, 396, 25 L.Ed. 1050 (1879) ("Where the principal is disclosed, and the agent is known to be acting as such, the latter cannot be made personally liable unless he agreed to be so."); *Atlantic & Gulf Stevedores, Inc. v. Revelle Shipping Agency, Inc.,* 750 F.2d 457, 459 (5th Cir.1985) ("In general, a maritime agent acting for a disclosed principal is not liable for claims arising out of contracts executed by the agent on behalf of his principal."). *See also* Restatement (Second) of Agency § 17 (1958) ("A person . . . subject to a duty[ ] to perform an act . . . can properly appoint an agent to perform the act . . . unless public policy or the agreement with another requires personal performance"). Here, the congressional aim underlying the signature requirement involves protecting seamen from unscrupulous employers. That goal is not frustrated when an agent signs the contract on behalf of the vessel owner or master, because the ·principal is still bound by the contract. For the same reason, we see no objection to allowing a single agent to sign for both the owner and the master. In short, when the vessel owner or master delegates the task of signing the contract, there is no violation of section 10601(a).[7]

### IV

▮ We turn finally to the issue of attorneys' fees. Although the contracts' choice-of-law provision specified that the agreement was governed by federal maritime law, the district court awarded the

appellants $339,651 in attorneys' fees and $43,583 in expanded costs under Rev.Code Wash. § 49.48.030. The federal maritime laws on seamen's "protection and relief," which appear in 46 U.S.C. §§ 11101–11112, make no provision for attorneys' fees. ASC appeals both the determination that state law rather than federal law controls on this issue, and the district court's interpretation of Washington state law as to litigation costs.

▮ "In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), . . . and its progeny. . . . But where the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice." *Chan v. Soc'y Expeditions, Inc.,* 123 F.3d 1287, 1296–97 (9th Cir.1997) (citations omitted) "Federal common law applies to choice-of-law determinations in cases based on . . . admiralty. . . . Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws." *Id.* at 1297 (citation omitted).

The principles governing analysis of choice-of-law provisions appear in Restatement (Second) of Conflict of Laws § 187 (1971), titled "Law Of The State Chosen By The Parties," which provides as follows:

(1) The law of the state chosen by the parties to govern their contractual

---

7. The appellants argue, for the first time on appeal, that the vessel masters' failure to sign the contracts violated section 10601(a) because the vessel masters were completely unaware of the terms of the contract. We generally do not consider arguments that were not raised in the district court. *See, e.g., Slaven v. Am. Trading Transp. Co.,* 146 F.3d 1066, 1069 (9th Cir.1998). We note, however, that the record shows that the vessel masters attended orientation sessions where the bonus system was explained, and that the record includes correspondence between the vessel masters and ASC Human Resources officials on compensation matters. The record shows that the vessel masters were aware of the contracts' terms.

rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Here, when considering the application of section 187, the district court correctly focused on Restatement (Second) of Conflict of Laws § 187(2) rather than subsection (1), despite ASC's emphasis on subsection (1). In our view, subsection (1) does not apply because, as the Restatement explains, "The rule of this Subsection is a rule providing for incorporation by reference." *Id.* at cmt. c. As the illustrations accompanying that comment make clear, subsection (1) applies where the contract provides that a particular matter in the contract is to be governed by the law of the specified forum. Here, the agreement provided that federal maritime law governed the entire contract rather than the particular issue of attorneys' fees. Federal maritime law was not incorporat-ed by reference as to any particular matter in the contract.

We therefore analyze the choice-of-law clause under subsection (2). The district court focused only on subsection (2)(b) and concluded that because the state of Washington has a "strong public interest" in matters such as wages and attorneys' fees, Washington state law governs. We disagree, because we have a different analysis of Restatement (Second) of Conflict of Laws § 187(2).

First, under Restatement (Second) of Conflict of Laws § 187(2)(a), the United States has a substantial relationship to the parties, because the agreements were maritime employment contracts, which have been regulated by federal law for more than two centuries. The appellants themselves initiated this action on the ground that their employment contracts did not conform with the requirements of 46 U.S.C. § 10601(a). It would be strange to conclude that the agreements are governed by federal maritime law, which has the power to void the contracts and to substitute a significantly higher wage scheme, but that the federal government nevertheless lacks any substantial relationship to the parties whose rights and powers are thus governed. To the contrary, the federal interest in a maritime contract governing seamen's wages is manifest, salient, and must be weighed on the issue of choice of law in this admiralty case.

Second, under Restatement (Second) of Conflict of Laws § 187(2)(b), even if the state of Washington has a "strong public interest" in the matter of attorneys' fees for a wronged seaman who is forced to sue an employer on a contract, the record contains no showing that Washington here "has a *materially greater* interest than the U.S. and would be the chosen law in the absence of a choice. clause." *Chan*, 123

F.3d at 1297 (emphasis added).[8] Conversely, that the United States has a genuine and significant interest in the matters affected by the contract is apparent from the federal regulatory power discussed above and from the time-honored maxim that "seamen 'are emphatically the wards of the admiralty.'" *Chandris, Inc. v. Latsis,* 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (quoting *Harden v. Gordon,* 11 F. Cas. 480, 485 (C.C.Me. 1823)). Here, where the seamen were hired in Washington but came from many other places as well, the interest of the state of Washington in our view cannot be said to be materially greater than that of the United States. To be effective, ASC's choice of federal maritime law needs to satisfy only one of the two alternative requirements under section 187(2); in fact, it satisfies both of them: The federal government has a substantial interest in the treatment of seamen and the state of Washington does not have a materially greater interest.

The appellants raise three arguments against applying section 187(2), none of which persuade us to the contrary. First, the appellants contend that section 187 is superseded by *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). As we have explained above, *Lauritzen* applies in the *absence* of a contractual choice-of-law clause. *Lauritzen* does not supersede section 187 as a matter of course, and has no application here.

■■■ Second, the appellants argue that the fishing agreement is an adhesion contract whose provisions "should not be enforced if assent to them was obtained through unequal bargaining positions wherein the weaker party had no real opportunity to negotiate the terms." *M/V Am. Queen v. San Diego Marine Constr. Corp.,* 708 F.2d 1483, 1489 (9th Cir.1983). Similarly, the Restatement provides that courts should not apply choice-of-law provisions in adhesion contracts "if to do so would result in substantial injustice to the adherent." Restatement § 187 cmt. b. While *M/V American Queen* mentioned these considerations, it did not hold that the contract under review there was unenforceable, because there was "no evidence that [the employer] was overreaching or taking undue advantage of [the employee]." 708 F.2d at 1489. Similarly, no such evidence appears here. We cannot conclude, based on our study of the record and total circumstances, that to enforce the contract's designation of federal maritime law would result in a "substantial injustice" on the seamen.

■■■ Last, the appellants contend that no part of the Restatement can be used in analyzing a choice-of-law matter that involves choosing between federal law and the law of a particular state. For support, the appellants point to the provision setting out the subject matter of the Restatement, which, they assert, excludes such questions. *See* Restatement § 2 cmt. c (listing "Federal–State conflicts" among the "types of conflicts that are not dealt with directly in the Restatement of this Subject," and explaining that "[i]n the United States, there is the ever-present problem of determining the respective spheres of authority of the law and courts

---

**8.** Literally, Restatement (Second) of Conflict of Laws § 187 would look at the law of a "state" chosen by the parties and then would contrast the interest of that state against the interest of a state whose law would apply absent contract. In this case, the chosen law is "the general maritime laws of the United States and applicable United States Statutes," meaning the federal common and statutory law governing cases in admiralty. We read section 187(2) in this context to mean that it is the federal interest that must be assessed and weighed against the interest of any state whose law would otherwise apply.

of the nation and of the member States."). As we see it, however, this provision speaks to the Restatement's avoidance of questions of federal *preemption* of state law. *See, e.g., Morrisania II Assoc's v. Harvey,* 139 Misc.2d 651, 527 N.Y.S.2d 954, 958 (1988) (citing this provision for the proposition that "where a conflict exists between state and federal law in an area properly within congressional jurisdiction, federal law controls."); Mary P. Twitchell, *Characterizing Federal Claims: Preemption, Removal, and the Arising Under Jurisdiction of the Federal Courts,* 54 Geo. Wash. L.Rev. 812, 858 (1987) (citing this provision for the proposition that "[t]he Restatement does not directly discuss federal-state conflicts arising from preemption."). The exclusion of matters involving federal-state preemption, however, does nothing to prevent the use of section 187 to analyze a contract's choice-of-law clause specifying that federal law will apply.

We consider the principles stated in Restatement (Second) of Conflict of Laws § 187 to the extent we conclude, as here, that they are persuasive. In our view, the sound reasoning of section 187 supports our conclusion that the issue whether attorneys' fees are to be awarded on a contractual claim pursuant to the processors' agreements with ASC is governed by federal maritime law, as provided in the choice-of-law clause. Under federal maritime law, no attorneys' fees may be awarded in this case, where the district court explicitly held that ASC had acted in good faith.[9] We reverse the district court's grant of attorneys' fees and expanded litigation costs to the appellants.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.** Each party is to bear its own costs on appeal.

---

9. We do not lightly reverse the district court's conclusion on this difficult issue, for we can see it may have been motivated by a not unreasonable sense that the processors need to recover attorneys' fees to place them in the same position they would have held absent contract breach by ASC on how the bonus was to be funded. However, our analysis leads us to the inescapable conclusions that federal maritime law applies and that under it, applied to the facts determined by the district court upholding the good faith of ASC in this contract dispute, an attorneys' fee award is not here permissible.