Filed 8/9/13; pub. order 8/23/13 (see send of opn.)


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| HOWARD J. BRANDWEIN, Individually and as Trustee etc., et al., Plaintiffs and Appellants, v. ROBERT BUTLER et al., Defendants and Respondents. | D059413 (Super. Ct. No. 37-2008-00090249-CU-CO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge.  Affirmed.


Lawrence Silver, Karen S. Lai, Silver & Field for Plaintiffs and Appellants Howard J. Brandwein, Individually and as Trustee of the Howard J. Brandwein Trust and Jeri Geblin.

Anthony Joseph Passante, Martin & Passante for Defendants and Respondents Robert Butler and Western Maritime, Inc.

Forrest Booth, Erik M. Kowalewsky, Severson & Werson for Defendants and Respondents Ace Global Markets Ltd. Syndicate 2488, Axis Specialty Europe Limited, Ireland, UK Branch and G.S. Christensen and Others Syndicate No. 958, Certain Underwriters at Lloyd's of London.

Neil S. Lerner, Arun Dayalan, Sands Lerner for Defendants and Respondents Oversea Insurance Agency, Inc., Scott Jarvie and Nichole Mayer.

I

INTRODUCTION

This action was brought by plaintiffs Howard J. Brandwein (Brandwein), a related trust, and Jeri Geblin (Geblin) (collectively, plaintiffs) to recover losses allegedly suffered as a result of unsuccessful efforts to salvage Brandwein's 65-foot yacht, the *Sea Bear*, which ran aground in April 2007 on a Mexican beach. The insurer of the *Sea Bear*, ACE Global Markets, Ltd. et al. (the Underwriters),[1] paid Brandwein the full amount of the insurance policy proceeds, $1,540,000, after the loss of the vessel. Brandwein, however, claimed losses in excess of that amount, contending that the vessel had been underinsured because the value of upgrades had not been taken into account, and also that he suffered emotional distress as a result of the sinking of his yacht and loss of personal

---

[1] "The Underwriters" refers to the following party defendants, collectively: ACE Global Markets, Ltd. Syndicate 2488 (which the Underwriters contend was erroneously sued as ACE Underwriting Managing Agencies Limited Syndicate 2488); Axis Specialty Europe Limited, Ireland, UK Branch (erroneously sued as Axis Specialty Europe Limited, UK Branch); and G.S. Christensen and Others Syndicate No. 958. All of these, the Undewriters contend, were erroneously sued as Certain Underwriters at Lloyd's of London.

effects during the salvage operation. Plaintiffs brought an action to recover damages from multiple parties, including the Underwriters, Oversea Brokers,[2] who procured the insurance from the Underwriters, and Western Maritime,[3] the entity whose attempted salvage operation resulted in the total loss of the *Sea Bear*.

As a result of pretrial rulings, all the claims against the Underwriters and two claims against Oversea Brokers were dismissed, and Brandwein's request for emotional distress damages was stricken. Specifically, the trial court sustained Oversea Brokers's demurrer to plaintiffs' claims in the first amended complaint (FAC) arising from allegations that Oversea Brokers had failed to make inquiries about improvements to the vessel and advise Brandwein about insuring the full fair market value of the *Sea Bear*. As to those claims, the trial court found that it was Brandwein's legal duty to provide Oversea Brokers with all material information relating to the value of the *Sea Bear*, not Oversea Brokers's duty to inquire about increased value. The trial court also sustained the Underwriters' demurrer to the third amended complaint (TAC) as to all claims against them. In brief, the trial court concluded that Brandwein had released any negligence claims he might have had against the Underwriters as part of a settlement agreement entered into with the Underwriters in August 2008. The court also found that Brandwein had surrendered the insurance policy upon receiving payment of the insurance proceeds

---

[2]    "Oversea Brokers" collectively refers to Oversea Insurance Agency, Inc, Scott Jarvie and Nichole Mayer.

[3]    "Western Maritime" refers collectively to Robert Butler (Butler) and Western Maritime, Inc.

from the Underwriters and, thus, there was no longer any contract between them that could support a bad faith claim. Finally, the court concluded that emotional distress damages are not available under federal maritime law.

A jury trial was held on plaintiffs' remaining claims against Oversea Brokers and Western Maritime. The jury entered a verdict against Brandwein on the claim that Oversea Brokers had been negligent in the hiring of Western Maritime for the salvage operation. However, the jury found for Brandwein and against Western Maritime based on the latter's gross negligence during its salvage attempt. The jury awarded Brandwein damages on that claim in the amount of $1.45 million—equal to the purchase price of the vessel. The trial court entered judgment accordingly.

Brandwein does not appeal the jury's verdicts. Rather, he challenges the trial court's pretrial orders sustaining the demurrers of Oversea Brokers and the Underwriters to the FAC and TAC, respectively, as well as the order striking his request for emotional distress damages. We conclude the trial court did not err in these rulings and, accordingly, affirm the judgment.

II

FACTUAL AND PROCEDURAL BACKGROUND[4]

A.      *The Loss of the Sea Bear*

Brandwein purchased the *Sea Bear*, an ocean-going yacht, with the intent of using it not merely as an investment but as a home with Geblin, his life partner.[5]  Brandwein paid $1.45 million for the boat, but upgraded and refitted it with extra equipment and other items.  Brandwein believed the value of the *Sea Bear* exceeded $3 million.  In February 2007, Oversea Brokers procured from the Underwriters an insurance policy covering, among other things, the *Sea Bear*'s hull, machinery, personal effects, and tender and outboards, in the amount of $1.54 million.  Brandwein alleged that the Underwriters and Oversea Brokers "knew or should have known that the SEA BEAR was not fully insured" under the Underwriters' policy.  A copy of the policy was attached to the FAC.

---

[4]      Because Brandwein appeals the trial court's rulings on defendants' demurrers, we summarize the facts principally as they were alleged in the relevant first and third amended complaints.  (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*) [on demurrer court looks to allegations of complaint to see whether they state a claim].)  Consistent with the limited scope of our review in this appeal, we deny Brandwein's motion to augment the record with multiple additional documents relating to the Underwriters' unsuccessful attempt to secure a lien against the judgment awarded to Brandwein.  The materials that are the subject of that motion are, as Brandwein concedes, not essential to this appeal and, in our view, are irrelevant to the issues before us.

[5]      Geblin is named as a plaintiff in all the complaints, but was dismissed from the case for lack of standing to sue.  As far as we can discern, she is not a part of this appeal.

Brandwein alleged that, on or about April 14, 2007, the *Sea Bear* "became distressed at sea" and ran aground on a beach near Manzanillo, Mexico.[6] Western Maritime was selected—allegedly by Oversea Brokers, who was acting for the Underwriters—to perform the salvage operation. Brandwein alleged that even though Western Maritime had "been engaged" by the Underwriters, Butler, Western Maritime's employee, represented to Brandwein that he required Brandwein to execute an agreement to pay for the costs involved with the salvage operation. Brandwein alleged he signed the agreement "under duress." On April 24, 2007, during Western Maritime's attempt to remove the *Sea Bear* from the beach and bring it to a safe location, the yacht sank "and was a total loss."

Brandwein alleged that Western Maritime did not have the skill, experience or equipment to perform the salvage operation, which the Underwriters knew or should have known, and that the loss was "due to the failure of [Western Maritime] to exercise reasonable care." He further alleged that Western Maritime demanded that the Underwriters pay its fees and costs, but the Underwriters "refused to pay" Western Maritime because its salvage efforts were "negligent and below any reasonable standard of care."[7] Brandwein also alleged that the Underwriters "employed certain surveyors to

---

[6]    As was later revealed, and as Brandwein candidly acknowledges, he initially told his insurer that the boat experienced engine failure, but in truth, Brandwein fell asleep at the helm. Although not directly pertinent to the issues on appeal, we observe that no party has provided any record citation supporting this explanation.

[7]    Notwithstanding these allegations, Brandwein concedes in his opening brief that the Underwriters paid Western Maritime for its services, and indeed, he suggested as

evaluate the work done and efforts undertaken by [Western Maritime] and fees and costs presented to the Underwriters by [Western Maritime]."

Brandwein made a claim under the insurance policy for the loss of the *Sea Bear*. He alleged that he and the Underwriters ultimately entered into a settlement agreement by which the Underwriters paid him for the loss of the vessel "to the full extent that it was insured [$1.54 million], leaving the uninsured value of the SEA BEAR to plaintiff Brandwein's loss." The August 31, 2007 settlement agreement, attached to the FAC and TAC, released the Underwriters from "any and all liability, claims, demands, liens, mortgages and all other claims of ownership or interest" in the *Sea Bear* "for damage to and loss of the vessel and personal effects," subject to certain specified reservations of rights. Brandwein also "tender[ed] and surrender[ed] the policy of insurance . . . relative to any accident or incident post-dating the subject loss, the vessel having been declared a total loss, in full and complete satisfaction of the claim and damages presented herein." Finally, the settlement agreement obligated the Underwriters "to assist and cooperate with Dr. Brandwein in any action brought by him for recovery against any person or entity regarding claims other than the claims against the Underwriters settled here relating to SEA BEAR." Brandwein alleged in the FAC that "incident to the settlement," the Underwriters agreed to "provide to Brandwein certain writings," including any "surveyor's report(s) relating to the loss of the SEA BEAR."

_____

much in both the first and third amended complaints. There is no allegation in either the first or third amended complaints that Brandwein made any payment whatsoever to Western Maritime under the salvage contract, or otherwise.

7

B.      *The Lawsuit and Pretrial Rulings*

Brandwein, together with the Howard J. Brandwein Trust and Geblin (an alleged beneficiary of the trust) filed the first complaint in Ventura County on April 23, 2008.[8] The action subsequently was transferred to San Diego County.  The Underwriters and Western Maritime answered the complaint, but Oversea Brokers demurred.  Before any action was taken on the demurrer, Brandwein filed the FAC, naming as defendants the Underwriters, Oversea Brokers, and Western Maritime.

In that amended complaint, Brandwein first sought a judicial declaration that the Underwriters were responsible to pay the expenses of the salvage effort, that Oversea Brokers and Western Maritime were the agents of the Underwriters in the salvage effort and, thus, responsible for damages arising therefrom, that the Underwriters acted in bad faith by failing to agree to hold Brandwein harmless from any claim against him by Western Maritime, and that the settlement agreement did not preclude the action against the Underwriters.  The second and third causes of action against Oversea Brokers alone alleged breach of duty and negligence in failing to advise Brandwein of his ability to insure the *Sea Bear* at its full fair market value, and in failing to inquire about any improvements that increased the value of the *Sea Bear*, as a result of which the vessel was underinsured.  The fourth cause of action against the Underwriters and Oversea Brokers alleged these defendants' negligence in the selection of Western Maritime for the salvage operation and in supervising those efforts.  The fifth and sixth causes of action

_____

[8]      Apparently, the *Sea Bear* was owned in the name of the trust, of which Brandwein is the sole trustor and trustee.

against the Underwriters were based on the insurer's alleged breach of contract in failing to provide Brandwein with promised documents before his commencement of the lawsuit, and in "fail[ing] and refus[ing] to acknowledge [the Underwriters'] obligations" under the insurance policy to pay for Western Maritime's salvage efforts. The seventh cause of action alleged the Underwriters acted in bad faith by, among other things, failing to select a competent salvager, and failing to provide promised information regarding the loss of the *Sea Bear*, including whether others might have liability to Brandwein. The eighth, ninth and tenth causes of action alleged negligence and fraud against Western Maritime. Finally, the eleventh cause of action alleged that Western Maritime acted as the Underwriters' agent, rendering the Underwriters responsible for Western Maritime's negligence.

Western Maritime and the Underwriters answered the FAC. Oversea Brokers filed a demurrer to the second, third and fourth causes of action. It argued principally that it had no duty to either advise Brandwein that he should procure additional insurance for the *Sea Bear*, or to inquire about any improvements to the *Sea Bear*, and in fact, Brandwein violated his duty of uttermost good faith under maritime law (known as "*uberrimae fidei*") to fully disclose all facts material to the risk being covered—in particular, that the *Sea Bear* had been upgraded and allegedly was worth far more than its purchase price. In addition, Oversea Brokers argued that Brandwein did not allege facts sufficient to support his negligence claim, and specifically, that he failed to allege any legal duty and breach of any duty with respect to Oversea Brokers' alleged negligent hiring of Western Maritime.

9

On February 27, 2009, the trial court sustained the demurrer without leave to amend as to the second and third causes of action, and sustained the demurrer as to the fourth cause of action with leave to amend. The record does not contain any tentative or final order reflecting the trial court's reasoning; however, as to the second and third causes of action, the transcript of the demurrer hearing indicates the trial court agreed with Oversea Brokers that admiralty law applied and that Brandwein failed in his duty to disclose all material facts to Oversea Brokers. With respect to the fourth cause of action, the trial court opined that Brandwein should be given the opportunity to amend the complaint to add facts clarifying that Oversea Brokers voluntarily took upon itself the duty to select the salvager and supervise the salvage operation, but fulfilled that duty negligently when it hired Western Maritime for that purpose.

Brandwein promptly sought reconsideration of the court's decision to deny leave to amend as to the second and third causes of action. He explained that he "did not anticipate the Court's ruling" and in particular, the decision to deny leave to amend. He therefore asked for leave to amend so that he could allege facts—admittedly known before the filing of the action—showing that Oversea Brokers knew the *Sea Bear* had undergone renovation and upgrades but nevertheless failed to advise Brandwein that the upgrades should be added to the value of the yacht for insurance purposes. The court denied Brandwein's motion for reconsideration, holding that Brandwein failed to adequately explain why he did not allege the foregoing "new" facts earlier. Moreover, the court explained, the proposed new allegations would contradict the FAC's allegations that Oversea Brokers failed to ask about improvements to the *Sea Bear* and to advise

Brandwein about procuring more insurance, the import of which was that Brandwein "did not disclose information to [Oversea Brokers] regarding any increased value from the purchase price."

In relevant part, Brandwein's second amended complaint amended the negligent hiring cause of action against Oversea Brokers and the Underwriters by alleging that Oversea Brokers "undertook to direct, control, and be fully in charge of all activities in any attempt to salvage the SEA BEAR," and "excluded the plaintiffs from any activity they may wished to have engaged in the attempted salvage of the SEA BEAR."  The second amended complaint also alleged that Oversea Brokers, "by and for themselves and for and under the supervision and direction of" the Underwriters, negligently "selected" and "approved the actions of" Western Maritime in the attempted salvage of the vessel. Both Oversea Brokers and the Underwriters filed demurrers to this complaint, while Western Maritime again answered.

The trial court sustained Oversea Brokers' demurrer to the negligent hiring cause of action, finding that while Brandwein "properly pleaded a duty assumed, [he has] not pleaded sufficient allegations to impose liability for negligent maritime salvage." Specifically, the court concluded Brandwein failed to allege either that Western Maritime's actions worsened the *Sea Bear*'s situation, or that those actions were reckless and wanton.  The court granted Brandwein another opportunity to amend that claim. With respect to the Underwriters' demurrer, the court overruled it as to the causes of action alleging the Underwriters' breach of contract and bad faith, holding they concerned the Underwriters' alleged failure to acknowledge obligations under the insurance policy

11

"that are not affected by the settlement agreement." However, the court sustained the Underwriters' demurrer without leave to amend as to the declaratory relief claim, and also dismissed Brandwein's Trust and Geblin as plaintiffs, holding that only Brandwein, as trustee for the Trust, had standing to sue. The trial court further sustained the Underwriters' demurrer, with leave to amend, as to 1) the cause of action for breach of contract based on the Underwriters' alleged failure to deliver documents, due to Brandwein's failure to allege consideration; and 2) the causes of action alleging negligent hiring of Western Maritime and agency, holding, as it did with respect to Oversea Brokers, that Brandwein had not pled the necessary allegations to support a claim of negligent maritime salvage.

Brandwein filed the TAC in August 2009, and attached to it copies of the insurance policy; pages from Oversea Broker's website; the salvage contract with Western Maritime; the settlement agreement with the Underwriters; and correspondence with the Underwriters' counsel regarding the language of the settlement agreement's release and the Underwriters' alleged promise to provide documentation relevant to Western Maritime's potential liability. The TAC alleged eight causes of action, including the negligent hiring and supervision of Western Maritime by the Underwriters and Oversea Brokers; breach of contract, bad faith and negligence/agency against the Underwriters; and duress, fraud and negligence against Western Maritime. Once again, the Underwriters and Oversea Brokers demurred, and Western Maritime answered.

The trial court overruled Oversea Brokers' demurrer to the negligent hiring cause of action, concluding the TAC sufficiently alleged (1) that Western Maritime's salvage

12

efforts had worsened the position of the *Sea Bear*, in that Brandwein alleged a competent salvager might have rescued the vessel, and (2) that Western Maritime had acted recklessly and wantonly. However, the court sustained the Underwriters' demurrer as to all claims without leave to amend. This time, the court concluded that the release in the settlement agreement precluded the negligence claims against the Underwriters. The court also held that Brandwein's bad faith claim failed because Brandwein had surrendered his insurance policy. "Because there is no longer a valid insurance contract, it is not possible to plead a claim of bad faith." Finally, the court found Brandwein had no viable breach of contract claims arising from his allegations that the Underwriters agreed to provide documentation to support Brandwein's case against Western Maritime, and that the Underwriters had failed to fulfill their obligations to indemnify and defend against any claim made against Brandwein in connection with the salvage efforts.

Prior to trial, Western Maritime and Oversea Brokers moved to strike Brandwein's request for emotional distress damages. The trial court granted the motion, holding that such damages are not recoverable under maritime law when, as in this case, plaintiff alleges the damages resulted from injury to property alone, rather than physical injury.

C.    *The Trial, Verdict and Judgment*

The remaining claims against Oversea Brokers and Western Maritime were tried to a jury in July and August 2010. On August 12, 2010, the jury issued its verdict, finding in favor of Brandwein and against Western Maritime on the claim that Western Maritime was grossly negligent, or wanton and reckless, in attempting to salvage the *Sea Bear*. The jury awarded Brandwein $1.45 million. However, the jury found in favor of

13

Oversea Brokers and Western Maritime on all other claims. On February 3, 2011, the trial court entered final judgment reflecting the jury's verdict, as well as the court's earlier demurrer rulings.

III

DISCUSSION

A.    *Applicable Standards of Review*

Brandwein appeals only the trial court's pretrial orders sustaining the demurrers of the Underwriters and Oversea Brokers, as well as the court's order striking his request for emotional distress damages. We employ a de novo standard when reviewing orders sustaining a demurrer without leave to amend. (*Wilson v. Hynek* (2012) 207 Cal.App.4th 999, 1007 (*Wilson*); *Behnke v. State Farm General Ins. Co*. (2011) 196 Cal.App.4th 1443, 1452 (*Behnke*).) The considerations governing our examination of the trial court's demurrer rulings are well established:

> "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed. [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action."

(*Blank*, *supra*, 39 Cal.3d at p. 318; see also *Czajkowski v. Haskell & White, LLP* (2012) 208 Cal.App.4th 166, 169-170; *Wilson*, *supra*, 207 Cal.App.4th at p. 1007 ["we give no credit to allegations that merely set forth contentions or legal conclusions"].)

Section 436 of the California Code of Civil Procedure allows a court to "[s]trike out all or any part of any pleading not drawn or filed in conformity with the laws of this

14

state . . . ."  (Cal. Code Civ. Proc. § 436, subd. (b).)  Generally, a court's order striking a portion of a pleading is reviewed for abuse of discretion.  (*CLD Construction, Inc. v. City of San Ramon* (2004) 120 Cal.App.4th 1141, 1145.)  The reviewing court "will disturb the ruling only upon a showing of a ' " 'clear case of abuse' " ' and a ' " 'miscarriage of justice.' " ' "  (*Quiroz v. Seventh Avenue Center* (2006) 140 Cal.App.4th 1256, 1282.)

To the extent we are required in this case to determine whether the trial court properly interpreted and applied the governing law in concluding that Brandwein had failed to state certain claims as a matter of law, we do so independently.  (See *People ex rel. Lockyer v. Shamrock Foods Co*. (2000) 24 Cal.4th 415, 432 [a court's statutory interpretation presents a pure question of law that is examined de novo]; *McGhan Medical Corp. v. Superior Court* (1992) 11 Cal.App.4th 804, 809 ["Questions of law are reviewed under the nondeferential standard."].)  Similarly, the trial court's construction of the language of the settlement agreement between the Underwriters and Brandwein is reviewed de novo, inasmuch as there is no conflicting extrinsic evidence as to its meaning.  (See, e.g., *Citizens for Goleta Valley & Goleta Valley Land Trust v. HT Santa Barbara* (2004) 117 Cal.App.4th 1073, 1076 ["The parties agree that, because there is no conflicting extrinsic evidence, we must independently construe the settlement agreement."]; citing *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 (*Parsons*).)

15

B.     *The Trial Court Correctly Sustained Oversea Brokers's Demurrer to the Claims Alleging Failure to Make Inquiries and to Properly Advise Brandwein Regarding the Amount of Insurance Coverage*

1.     Under Federal Maritime Law and California Law, Brandwein Cannot Shift to Oversea Brokers the Responsibility for His Own Failure to Disclose Material Information about the *Sea Bear*'s Value

Brandwein first challenges the trial court's order sustaining, without leave to amend, Oversea Brokers's demurrer to the second and third causes of action alleged in the FAC. These negligence claims alleged, respectively, that Oversea Brokers failed to properly advise Brandwein in regard to insuring the *Sea Bear* for its full market value, and failed to fulfill its duty to inquire as to any increase in the yacht's value beyond its purchase price. We conclude the trial court properly held that the law imposed a duty of disclosure on Brandwein, and because the allegations of the FAC attempted to state a claim in contravention of that duty, the trial court did not err in sustaining Oversea Brokers's demurrer without leave to amend.

Although the record does not contain an order detailing the trial court's reasoning for sustaining the demurrer to these claims, at the hearing the trial court indicated that Oversea Brokers had no duty of inquiry or advisement as to Brandwein, but rather, it was Brandwein's duty to make full disclosure of facts as to his yacht's value. This latter duty is based on the maritime law doctrine of *uberrimae fidei*, or uttermost good faith. This doctrine is embodied in every marine insurance policy. (*Reliance Ins. v. McGrath* (N.D. Cal. 1987) 671 F. Supp. 669, 678 (*Reliance Ins. Co.*).) Pursuant to its tenets, an applicant for a marine insurance policy is "bound, *even absent inquiry*, to reveal every fact within his knowledge which is material to the risk." (*Id*. at p. 677, italics added; see also *Cigna*

16

*Prop. and Cas. Ins. Co. v. Polaris Pictures Corp*. (9th Cir. 1998) 159 F.3d 412, 420.)

California has codified this doctrine in section 1900 of the Insurance Code, which

provides:  "In marine insurance each party is bound to communicate, in addition to what

is required in the case of other insurance:  [¶]  (a)  All the information which he possesses

and which is material to the risk . . . .  [¶]  (b)  The exact and whole truth in relation to all

matters that he represents or, upon inquiry assumes to disclose."  (Ins. Code, § 1900; see

*Certain Underwriters at Lloyds v. Montford* (9th Cir. 1995) 52 F.3d 219, 222 fn. 1

(*Certain Underwriters*) [with respect to the duties imposed on parties to a marine

insurance contract, federal maritime law and California law are "materially the same"].)

Brandwein contends that the *uberrimae fidei* doctrine is irrelevant here because

Oversea Brokers is an insurance broker, not the underwriter of the risk, and not a party to

the insurance contract.  Instead, Brandwein argues, the trial court should have looked to

California common law, which imposes on insurance agents the affirmative duty to

exercise reasonable care in procuring insurance requested by the applicant.  Brandwein

further argues that because Oversea Brokers held itself out as an expert in marine

insurance, it owed the additional duties to inquire and make disclosures about insuring

the *Sea Bear* for its full market value.

We decline Brandwein's invitation to focus only on whatever duty of care Oversea

Brokers might have possessed as the insurance broker, and ignore Brandwein's own duty

to fully disclose material information.  That latter duty is "strict" one.  (*C.N.R. Atkin v.

Smith* (9th Cir. 1998) 137 F.3d 1169, 1171 (*C.N.R. Atkin*); Ins. Code, § 1900.)  It "is

different than it is under other types of insurance."  (*Reliance Ins. Co.*, *supra*,  671 F.

17

Supp. at p. 678.) The consequences of not making material disclosures cannot be passed off to another, including the insurance broker and even the insurer itself. Thus, the federal district court held in *Continental Ins. Co. v. Muradyan* (C.D. Cal. 2003) 2003 A.M.C. 1536 [2003 WL 22096119], that the insured could not maintain a negligence claim against his insurer for failing to verify information provided on the insurance application. (*Id*. at *5.) The court held "an insurer has the right to rely on an applicant's answers without verifying their accuracy." (*Ibid*.) The district court dismissed the negligence claim because it "appear[ed] that [the insured] is improperly attempting to shift [his] statutory duty to make complete disclosure onto [the insurer] to investigate the disclosure to ensure that it is truthful." (*Ibid*.; see also *C.N.R. Atkin*, *supra*, at p. 1171 [insured is responsible for misrepresentations made on insurance application by his co-captain/agent]; *Certain Underwriters*, *supra*, 52 F.3d at p. 222 [even though insured disclosed prior loss record to broker in connection with an earlier policy, because he failed to do so on subsequent policy, that policy was void ab initio; fact that insurer may be bound to know facts "open to inquiry" under separate Insurance Code provision "*does not override section 1900's mandate of complete disclosure by marine insurance applicants*" (italics added)].)

In the FAC's second and third causes of action, Brandwein improperly attempts to shift to Oversea Brokers the obligations that the doctrine of *uberrimae fidei* and Insurance Code section 1900 place squarely on *him*. Without citation to any pertinent authority, Brandwein declares that it was Oversea Brokers's "duty, their job, their professional and expert responsibility to make sure that the policy of insurance . . . is

18

bulletproof" and "not subject to attack."  Brandwein cites no law indicating that in the *maritime* context, insurance agents are charged with the affirmative duties both to independently investigate the true value of the vessel being insured, and to guarantee that the vessel has been fully insured, regardless of whether the insured has satisfied his or her own obligations to be forthcoming with material information.  The foregoing law, in fact, indicates the opposite is true.

We are not persuaded by Brandwein's argument that the doctrine of *uberrimae fidei* is not relevant here because it only applies when an insurer seeks to rescind an insurance policy.  To be sure, the cases addressing the insured's duty of full disclosure generally arise in the context of a dispute between insurer and insured over the validity or enforceability of a marine insurance policy.  Those cases also reveal, however, that the role of the insurance broker frequently is implicated when the insured seeks to avoid rescission by asserting the broker is responsible for omissions or misrepresentations in the insurance application.  (See, e.g., *Certain Underwriters*, *supra*, 52 F.3d at p. 222 [insured's misrepresentation on 1987 application is not mitigated by fact that he may have told the truth to agent two years earlier]; *Washington Int'l Ins. Co. v. Mellone* (C.D. Cal. 1990) 773 F.Supp. 189, 190-191, 194 [policy rescinded when broker failed to include ownership information on application, even though insured had disclosed that information to broker].)  Effectively, that is what Brandwein seeks to do here, albeit in a different context—that is, he seeks to hold Oversea Brokers responsible for the consequences of his own failure to reveal material facts about the *Sea Bear*'s value.

19

Brandwein insists, however, that he is only seeking to hold Oversea Brokers accountable for breach of its *own* duties. He cites a number of cases standing for the proposition that insurance agents or brokers have a general duty to exercise reasonable care and diligence in procuring insurance for another, and may assume a special duty to advise the insured about obtaining additional insurance by holding themselves out as having specific expertise in a particular area of insurance—as Oversea Brokers allegedly did here. (See, e.g., *Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1095-1096 [insurance agent or broker may assume special duty by "holding out" as being something more than an ordinary agent].) These cases, however, do not concern marine insurance policies, and therefore do not take into account the explicit duty imposed on Brandwein to disclose facts regarding the value of his yacht.

An analogous situation was presented in *Pacific Ins. Co. v. Kent* (C.D. Cal. 2000) 120 F.Supp.2d 1205, in which the court rescinded a marine insurance policy because the insured misrepresented on the application, among other things, the purchase price of the vessel. (*Id*. at pp. 1211, 1217.) The bank holding a lien on the vessel asserted a negligence claim against the insured's agent for failure to verify the information provided on the application. (*Id*. at p. 1217.) The district court granted summary judgment in favor of the insurance agent on that negligence claim. (*Ibid*.) Although recognizing that an insurance agent generally "assumes the duties of 'reasonable care, diligence, and judgment in procuring the insurance requested by the insured,' " the court held that in the marine context, that duty does not include independently investigating the value of the insured property. (*Ibid*. [an insurance agent generally has no duty to independently

20

investigate veracity of information on marine insurance application].) This is so, the court noted, particularly because of the insured's own duty to disclose truthful information under Insurance Code section 1900. "As such, *an agent that relies on the veracity of the statements made by a marine insurance applicant is acting reasonably*." (*Ibid*., italics added.)

As for Brandwein's contention that Oversea Brokers, by touting its expertise, assumed special duties to inquire and ensure that Brandwein had sufficient coverage, again, he cites no cases recognizing these duties in the marine insurance context. Instead, arguing that maritime law is silent on these special duties, Brandwein urges us to apply California state law, asserting that doing so "would not change the rights and obligations of the insured and insurer with respect to *uberrimae fidei*," but would vindicate important California interests in this issue. We disagree. In our view, applying the state law Brandwein urges would, at least under the facts present here, all but nullify the doctrine of *uberrimae fidei* and undermine the statutory duties spelled out in Insurance Code section 1900.

" 'State law may supplement federal maritime law, as in the exercise of its police powers or in the additional maritime tort remedy; state law may not, however, conflict with federal maritime law, as it would be *redefining the requirements or limits of a remedy available at admiralty*.' " (*Wells v. Liddy* (4th Cir. 1999) 186 F.3d 505, 524-525 (*Wells*) (italics added), quoting *Powell v. Offshore Navigation, Inc*. (5th Cir. 1981) 644 F.2d 1063, 1065, fn. 5.) State law "conflict[s] with general maritime law when it negatively impacts on admiralty's foremost goal—uniformity." (*Wells*, *supra*, at p. 525.)

21

Contrary to Brandwein's assertions, placing the onus on a broker of marine insurance to ferret out all the facts material to providing complete coverage of an ocean-going yacht, but *relieving* the insured of his or her own burden of disclosure, would fundamentally alter the obligations maritime law imposes in connection with the procuring of marine insurance, and thus work "material prejudice to the characteristic features of the general maritime law or interfere[] with the proper harmony and uniformity of that law." (*Fahey v. Gledhill* (1983) 33 Cal.3d 884, 887-888 (*Fahey*).) If Brandwein were correct, then insureds could escape the consequences of failing to satisfy their duty of disclosure simply by shifting the blame to their insurance agents for material nondisclosures under a "failure to inquire" theory. As we have seen, the law does not countenance that result. Accordingly, we conclude that, in the absence of allegations that Brandwein satisfied his own duty of uttermost good faith, as codified in Insurance Code section 1900, he may not maintain a negligence action against Oversea Brokers for allegedly breaching its own duty of care.[9]

Holding Brandwein to the duties imposed on him by both maritime law and state law does not mean, as Brandwein seems to suggest, that insurance brokers and agents have *no* duties of care with respect to marine insurance contracts. A corollary of our holding here is that if Brandwein *had* fully disclosed the facts about the value of the *Sea Bear*'s upgrades and its alleged true value, and Oversea Brokers had not then followed up

---

[9]      In view of this analysis, we need not address Brandwein's contention that the trial court erred in denying his request to judicially notice Oversea Brokers' Web site, which purportedly touts the broker's expertise in marine insurance.

22

or ensured that Brandwein was provided sufficient coverage, we might have been compelled to conclude that Brandwein has a cause of action against Overseas Brokers. That is not the case Brandwein pled, however. It is undisputed that Brandwein did not allege in the FAC that he and Geblin disclosed facts to Oversea Brokers about the *Sea Bear*'s upgrades and increased value. The FAC alleges only that Oversea Brokers "asked the plaintiffs how much the SEA BEAR was then insured for. Plaintiffs told defendant [Oversea Brokers] that the SEA BEAR was purchased for $1,450,000, and has been insured for the same amount." Brandwein also pled that Oversea Brokers "*did not ask* the plaintiffs if the SEA BEAR had, for any reason, increased in fair market value from the purchase price," "*did not ask*" about "the purchase and installation of upgrades," and "*did not ask*" about "the purchase and installation of additional equipment and items." (Italics added.) Additionally, in the second and third causes of action, Brandwein charged Oversea Brokers only with failing to advise Brandwein that it could insure the yacht in the amount of its fair market value, and with breach of an alleged "duty to disclose" and "duty to inquire" regarding the vessel's true value.[10]

To permit Brandwein to sue Oversea Brokers for the negligent failure to inquire and advise about obtaining insurance for the yacht's full market value—regardless of whether Brandwein himself disclosed material information on this subject—would

---

[10]    Brandwein claims he also alleged that Oversea Brokers's policy is only to insure the purchase price of the vessel, and that the broker represented to him this was the maximum coverage it would provide. Brandwein misstates the FAC, which, as noted, alleges merely that Oversea Brokers asked Brandwein about the purchase price of the vessel. There are no allegations in the FAC that Oversea Brokers made any representations about limits on coverage.

contravene both maritime and California law by relieving Brandwein of his own duty to disclose under the doctrine of *uberrimae fidei* and Insurance Code section 1900. For these reasons, the trial court properly sustained the demurrer to the second and third causes of action.

        2.      We Will Not Consider Brandwein's Argument that the Trial Court Should Have Permitted Him to Amend the Second and Third Causes of Action

Brandwein sought reconsideration of the trial court's order sustaining the demurrer to the second and third causes of action, and made an offer of proof of additional facts with which he stated he could amend his complaint to show that he had disclosed information about the vessel's upgrades to Oversea Brokers. Although he acknowledged he had known of these facts earlier, Brandwein argued he should be allowed to amend because he had not anticipated that the trial court would sustain Oversea Brokers' demurrer, or do so without granting leave to amend (which Brandwein had not sought in response to the demurrer). The trial court denied that motion on the ground that Brandwein failed to explain why these facts were not presented earlier, and in any event, the proffered facts contradicted the allegations of the FAC.

In his opening brief, Brandwein references these same facts, but provides no argument or authority demonstrating any error in the trial court's ruling on the motion to reconsider. In his reply brief as well, Brandwein alludes to the proposed additional facts, and then devotes almost five pages to arguing they do not contradict the FAC. Again, however, Brandwein provides no legal authority and no argument identifying any *legal* error in the trial court's ruling. Accordingly, we deem waived any challenge to the trial

24

court's order denying reconsideration and leave to amend.  (See *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18 [matters argued for the first time in reply brief will not be considered]; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*) [points asserted but unsupported with "reasoned argument and citations to authority" are deemed waived].)

C.      *The Settlement Agreement Barred Brandwein's Claims against the Underwriters*

1.      A Rational Reading of the Release Belies Brandwein's Assertion that the Parties Intended to Preserve Negligence Claims against the Underwriters

a.      Federal Maritime Law Governs this Issue of Contract Interpretation

The trial court found, citing California law, that the first and eighth causes of action[11] of the TAC, alleging negligence against the Underwriters are barred by the release provisions of the parties' settlement agreement.  Brandwein challenges that ruling, asserting that the release covered only claims for the policy proceeds, and that the reservations to the release preserved Brandwein's negligence claims against the Underwriters.  Although, in our view, this issue is governed by federal maritime law, not California or other state law, we conclude the trial court properly determined that the release barred plaintiffs' claims against the Underwriters for its alleged negligent hiring and supervision of Western Maritime.[12]

---

11      The eighth cause of action was erroneously pled as the "tenth" cause of action in the TAC.

12      Brandwein complains that the Underwriters demurred on this ground to the TAC even though the trial court already had rejected similar arguments when it overruled their demurrer to the second amended complaint.  However, nothing prevented the

We initially observe that the parties and the trial court relied on state law in addressing this question of contract interpretation. This is so even though the settlement agreement expressly provides: "[T]he terms and conditions of this settlement, receipt and release will be governed by the general maritime laws of the United States." Brandwein, while acknowledging this express choice of law, contends that in this instance, a court sitting in admiralty would apply California law. The Underwriters cite both New York and California law in support of its arguments. The parties provide no reason why their choice of law should not govern this issue, and we will abide by it. (See *Flores v. American Seafoods Co*. (9th Cir. 2003) 335 F.3d 904, 916 (*Flores*) ["where the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice"].) We acknowledge, however, that maritime law regarding contract interpretation is substantively similar to the general rules of contract interpretation. (See *F.W.F. Inc v. Detroit Diesel Corp*. (S.D. Fla. 2007) 494 F.Supp.2d

---

Underwriters from filing a demurrer to the same causes of action in a subsequent complaint, and nothing prevented the trial court from changing its mind when presented with the issue again on that later demurrer. (See, e.g., *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 389 fn. 3 [defendant is "entirely within its rights" to demur to a cause of action in a later complaint, notwithstanding its prior unsuccessful efforts to demur to that cause of action in the original complaint]; *Pacific States Enterprises, Inc. v. City of Coachella* (1993) 13 Cal.App.4th 1414, 1420, fn. 3 [if party believes initial demurrer was erroneously overruled, it " 'is acting properly in raising the point again, at [its] next opportunity,' " and the trial court is not bound by its prior ruling].)

26

1342, 1356 (*F.W.F., Inc*.) ["federal maritime law has adopted the general rules of contract interpretation and construction"].)[13]

> b. Viewed in Context, the Release Properly is Construed to Bar all Pre-Settlement Negligence Claims against the Underwriters for Damages Resulting from the Loss of the *Sea Bear*

When interpreting a contract, "the avowed purpose and primary function of the court is to ascertain the intention of the parties." (11 Williston on Contracts (4th ed. 1999) § 30.2, p. 16 (Williston).) Whenever possible, we attempt to discern the parties' intent first from the plain language of the contract. (*Flores*, *supra*, 335 F.3d at p. 910.) " '[A] written contract must be read as a whole, and every part interpreted with reference to the whole, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself.' " (*Ibid*.) When language in a written agreement is ambiguous, the trial court must resolve that ambiguity "in light of the apparent purpose of the contract as a whole, the rules of contract construction, and

---

[13]    As to Brandwein's unsupported contention that admiralty would yield to California law on the interpretation of the release and reservation of rights provisions, the California Supreme Court has affirmed that the parties' " 'choice of law provisions are usually respected by the California courts,' " and will be applied unless doing so " 'would be contrary to a fundamental policy of a state which has a materially greater interest' " than the one whose law the parties have chosen. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464, 465, quoting, in part, Rest.2d Conf. of Laws, § 187.) Brandwein has identified no fundamental policy of California that would be impaired by application of federal maritime law on this issue of contract interpretation. For that matter, the Underwriters have not made any similar argument favoring application of New York law. Although this may be largely an academic point given the similarity between general maritime and state law on this topic, Brandwein objected to the application of New York law, and specifically argued in favor of California law, and so we deemed it appropriate to address this question.

extrinsic evidence of intent and meaning." (*F.W.F., Inc.*, *supra*, 494 F. Supp. 2d at p. 1358.)

With these principles in mind, we turn to the release and related provisions of the parties' settlement agreement. The agreement broadly releases the Underwriters from "any and all liability, *claims*, demands, liens, mortgages and all other claims of ownership or interest" in the *Sea Bear* "for damage to and loss of the vessel and personal effects," subject to certain specified reservations of rights.[14] (Italics added.) The reserved rights are as follows:

> "The Parties, intending a reservation of rights to themselves, agree that nothing contained in [the settlement agreement] shall be deemed a release for the benefit of (1) *any person or entity who may have attempted to assist or assisted in the attempted rescue or salvage of the SEA BEAR*; (2) any person or entity, other than the Underwriters, who may have an obligation to pay Dr. Brandwein for any loss incurred in excess of amounts or outside of the coverage provided by the POLICY; and (3) the claims, if they are otherwise valid, against the Underwriters held by Dr. Brandwein under the POLICY that the Underwriters have and continue to have obligations to indemnify and defend against any claim made against Dr. Brandwein for the attempted rescue and salvage

---

[14] The release does not include a waiver of section 1542 of the Civil Code, which provides that a "general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." (Civil Code, § 1542.) Although Brandwein now contends he did not possess, before the settlement, knowledge of facts indicating the extent of Western Maritime's wrongdoing or the Underwriters' possible liability for the negligent hiring and supervision of Western Maritime, as is often the case in his briefs, he fails to point to any factual allegations in the TAC to that effect, and we have found none. In addition, Brandwein made no argument to the trial court that he should derive any benefit from Civil Code section 1542. (See, e.g., *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 [generally, the appellate court will not entertain arguments that could have been, but were not, asserted in the trial court].)

of the SEA BEAR or any other claim that arose before April 24, 2004, under the POLICY."  (Italics added.)

The trial court found the language of the release itself to be "unambiguous" and to preclude Brandwein's negligence claims.  Brandwein argued that the first reservation clause permitted assertion of those claims, contending that it explicitly uses the broad terminology "*any* person or entity" (italics added), and that he alleged the Underwriters attempted to "assist" in the salvage effort by negligently hiring and supervising Western Maritime.  The trial court, however, rejected this interpretation, finding that, if adopted, it would render the settlement void.  The court also opined that interpreting that first clause to apply to the parties themselves "would be internally inconsistent because the third section could create an obligation that the Underwriters defend against themselves."

At the outset, we agree with the trial court that the release language itself is unambiguous.  Brandwein released the Underwriters "from any and all liability, claims, [and] demands . . . for damage to and loss of the vessel and personal effects."  This language is certainly broad enough to encompass claims based on the Underwriters' alleged negligent hiring and supervision of Western Maritime leading to the total loss of the *Sea Bear*.  Brandwein does not dispute this.  Rather, in the trial court and again on appeal, the focus of his argument is that the parties carved out an exception to the release, specifically, claims against "any person or entity who may have attempted to assist or assisted in the attempted rescue or salvage" of the vessel.  However, in our view the trial court properly determined that interpreting this reservation of rights to include

29

unspecified negligence claims Brandwein might have against the Underwriters would essentially render the release a nullity and would lead to internal inconsistencies.

Brandwein argues that certain language in the opening recitals of the settlement agreement makes clear Brandwein was not releasing all his claims against the Underwriters. First, the agreement expressly acknowledged Brandwein's position "that the amount of the loss exceeds the coverage and that he is exploring potential claims *against others* for amounts and claims not insured." (Italics added.) Second, the agreement recites that Brandwein "is desirous of settling and resolving all of his claims against the Underwriters *for policy proceeds*"—not negligence or other claims he might have against the Underwriters. (Italics added.) Brandwein asserts that when these recitals are viewed together with the first clause of the reservation of rights, it is clear he released only those claims against the Underwriters for policy proceeds, not for tort damages in excess of the insured loss.

If that is true, however, then the release is essentially superfluous. Brandwein received payment for the full amount of his insurance, and thus had no other claim for the policy proceeds, so no purpose would be served by a release directed *only* at a claim for policy proceeds. Furthermore, if the intent of the parties was to release only claims pertaining to the amount of the policy itself, there was no reason to broadly release the Underwriters from "*all* liability, claims [and] demands . . . for damage to and loss of the vessel and personal effects" (italics added), or to explicitly *except* the Underwriters from the second reservation clause, which preserved Brandwein's claims against "any person or entity *other than the Underwriters*," based on "an obligation to pay Dr. Brandwein for

30

any loss incurred *in excess of amounts or outside of the coverage provided by the policy*." (Italics added, some capitalization omitted.) This language demonstrates a clear intent to release the Underwriters from claims beyond merely those for the policy proceeds, and we may not, as Brandwein would have us do, simply read it out of the settlement agreement. On the contrary, when interpreting a contract, we strive to interpret the parties' agreement to give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable. (See, e.g., Williston, *supra*, § 32.5, p. 427.)

Additionally, Brandwein overlooks that the reference in the recitals acknowledging Brandwein's exploration of "potential claims against others" appears directly after the recital that Brandwein "has filed a claim and proof of loss [with the Underwriters] for the damages sustained by the vessel in the amount of the insured value of the vessel USD $1,540,000.00, as agreed between the parties hereto." Since the reference to "potential claims against others" immediately follows the statement regarding the claim filed with the Underwriters, the term "others" logically refers to third parties and not the Underwriters. Viewed against the backdrop of these recitals, the term "any person or entity" appearing in the first clause reservation of rights also reasonably refers not to the parties themselves, but only to third parties, as the trial court implicitly found.

Brandwein insists, however, that the unqualified "any person or entity" language of the first clause of the reservation of rights evinces an intent to preserve other claims against the Underwriters, particularly when contrasted with (1) the second clause, which

31

uses that same language but with the specific qualifier—"other than the Underwriters", and (2) the third clause, which explicitly preserves certain rights Brandwein has for indemnification by the Underwriters under the "sue and labor" clause of the policy. The lack of a specific exclusion of claims against the Underwriters in the first clause, Brandwein contends, means that the phrase "any person or entity" in that clause includes the Underwriters.

The problem with this argument is that it leads to internal contradictions in the release and reservations of rights. As the trial court observed, if Brandwein's interpretation of "any person or entity" means literally just that, then theoretically the Underwriters could sue Brandwein for negligently assisting in the salvage effort under the first clause of the reservation of rights. In that instance, however, the Underwriters would have to defend against themselves pursuant to the terms of the third clause—a nonsensical result. Brandwein himself highlights, perhaps unintentionally, this internal contradiction, when he recognizes that "[b]ased upon [the first reservation] clause and only this clause, Underwriters could have sued Brandwein and a fortiori Brandwein can sue Underwriters," (italics and footnote omitted) but then states in a footnote that the policy "precluded such an action against Brandwein, but nothing in the [p]olicy precludes an action by Brandwein." In other words, Brandwein argues for a literal application of the phrase "any person or entity" while at the same time acknowledging such an interpretation does not comport with reality (at least as he sees reality).

The interpretation given the language of the release and reservation of rights by the trial court is the only one that gives substance and meaning to all the provisions of the

32

settlement agreement.  In contrast, Brandwein's rather tortured interpretation renders certain language illusory, or leads to internal contradictions.  Under settled authority, the trial court properly interpreted the release and reservation of rights language.  (See *Flores*, *supra*, 335 F.3d at p. 910.)

       2.       Brandwein Could not Allege his Contract and Bad Faith Claims against the Underwriters as a Matter of Law

             a.       The Parole Evidence Rule Bars Brandwein's Claim that a "Side Agreement" Existed with the Underwriters

In the TAC's second cause of action, Brandwein alleged that the Underwriters, "as part of and with the consideration Brandwein gave by entering into [the settlement agreement], agreed to produce for plaintiffs all documents relating to SEA BEAR and [Western Maritime]," including, specifically, any reports regarding the salvage effort.  He generally alleged he was damaged when the Underwriters "failed and refused to provide [Brandwein] with the promised documents *prior to* the filing of this action."  (Italics added.)  On appeal, Brandwein characterizes this alleged agreement as a "contemporaneous 'side' agreement supported by the same consideration as the written [settlement] agreement."

The settlement agreement between the Underwriters and Brandwein expressly provides that the Underwriters, in partial consideration for Brandwein's execution of that agreement, agreed "to assist and cooperate with Dr. Brandwein *in any action brought by him* for recovery against any person or entity regarding claims other than the claims against the Underwriters settled here relating to SEA BEAR."  (Italics added.)  This language indicates that the Underwriters' assistance, in providing documents or

33

otherwise, was required only *after* an action was brought by Brandwein, not prior to any such action, as Brandwein alleges.  The Underwriters argue that Brandwein's alleged "side agreement" is fatally inconsistent with this term of the settlement agreement, and further, that no separate consideration was alleged to support the existence of any independent, collateral agreement.

We need not address whether the alleged oral "side agreement" is consistent with the settlement agreement, because we conclude that the latter was intended to embody the parties' entire agreement on the subject of the Underwriters' promise to assist Brandwein in his litigation against others.  Therefore, Brandwein is precluded, as a matter of law, from seeking to add to or vary its terms by means of pleading an oral "side agreement" on the same subject.

It is well established that "where there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible to contradict a term of the writing." (Williston, *supra*, § 33.23, pp. 678-679.)  California has codified this principal in section 1856 of the Code of Civil Procedure.  (Code Civ. Proc., § 1856, subd. (a) ["Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."]; see also see *Esbensen v. Userware Internat. Inc*. (1992) 11 Cal.App.4th 631, 636 (*Esbensen*).)  However, where a writing is *not* intended as the complete embodiment of the parties' agreement, "[e]vidence of related oral understandings . . . is admissible to prove additional terms of the contract not inconsistent

34

with the express language of the writing." (*Esbensen*, at p. 637; see Williston, *supra*, § 33.14, pp. 612-614; § 33.15, pp. 616-617; Code Civ. Proc., § 1856, subd. (b).) The crucial threshold inquiry, therefore, and one for the court to decide, is whether the parties' intended their written agreement to be fully integrated.[15] (Williston, *supra*, § 33.14, p. 614 [application of parol evidence rule "depends on the existence of a valid, integrated contract"]; *Masterson v. Sine* (1968) 68 Cal.2d 222, 225 (*Masterson*); *Esbensen*, *supra*, at pp. 637-638 fn. 4.)

In making that determination, the court may look beyond the face of the writing for evidence of the parties' intent. (See, e.g., Williston, *supra*, § 33.23, pp. 679-681 [court may consider prior or contemporaneous agreements or negotiations to determine whether contract is integrated], citing Rest. 2d Contracts, § 215, com. a, p. 136; *Masterson*, *supra*, 68 Cal. 2d at pp. 226-227.) Thus, the mere fact that, as Brandwein notes, there is no explicit provision in the settlement agreement that the parties intended it to contain their complete agreement, is not itself dispositive. The integration inquiry is informed by other factors as well, including whether the alleged additional term was "(a) agreed to for separate consideration, or (b) [is] such a term as in the circumstances might naturally be omitted from the writing." (Rest.2d Contracts, § 216 subd. (2), p. 137; see

---

[15]   We may address this issue here inasmuch as the integration issue is "a question of law subject to plenary appellate review where the foundational extrinsic evidence is not in conflict." (*Esbensen*, *supra*, 11 Cal.App.4th at p. 638 fn. 4; see also *F.W.F., Inc.*, *supra*, 454 F.Supp.2d at pp. 1363-1364 [in case governed by maritime law, court made determination that writing was intended as final expression of parties' agreement].) The settlement agreement and the correspondence that Brandwein argues supports the alleged "side agreement" were all attached to the TAC, and their contents are not in dispute. The Underwriters presented no conflicting extrinsic evidence.

35

also Williston, *supra*, § 33.24, pp. 690 [citing Restatement], § 33.25, pp. 694-695.) According to the Restatement, affirmative answers to these inquiries indicate the writing was not intended to encompass all of the parties' agreements, which would permit proof of a collateral agreement. (Rest.2d Contracts, § 216 subd. (2), p. 137; see also Williston, *supra*, § 33.25, pp. 695-696 [test is whether reasonable parties would "naturally" enter into both the written agreement and the alleged parole agreement simultaneously]; *Masterson*, *supra*, at p. 227.)

Brandwein did not allege that the "side agreement" to produce documents was supported by separate consideration. On the contrary, he expressly alleged in the TAC that the Underwriters made this additional promise "as part of and with the consideration Brandwein gave by entering into" the settlement agreement. Likewise, he emphasizes here that the Underwriters' promise to provide information was "supported by the same consideration as the written agreement." The trial court afforded Brandwein the opportunity to amend the second amended complaint to allege separate consideration, but no such allegations were added, and it was on that basis that the trial court sustained the Underwriters' demurrer to the TAC on this claim without leave to amend. The absence of allegations that separate consideration supported the "side agreement" undermines Brandwein's assertion that the settlement was not an integrated writing. (Rest.2d Contracts, § 216 (2).)

Additionally, Brandwein has not alleged any facts, or presented any evidence, indicating that the alleged oral promise to provide documents *before* any litigation was commenced is the type of agreement that might naturally be excluded from the parties'

36

writing. (Rest.2d Contracts, § 216, subd. (2).) Indeed, precisely the opposite appears to be true. First, the settlement agreement was a negotiated document, not a "form" agreement of the type that might inhibit the insertion of additional terms. (See Williston, *supra*, § 33.28, p. 714 [formalized writing may not lend itself to inclusion of parties' whole agreement]; *Masterson*, *supra*, 68 Cal.2d at p. 228 ["the difficulty of accommodating the formalized structure of a deed to the insertion of collateral agreements makes it less likely that all the terms of such an agreement were included"].) Second, the settlement agreement explicitly addressed the subject of the Underwriters' assistance to Brandwein in connection with litigation against others. The Underwriters, in addition to making full payment under the policy, agreed to assist Brandwein "in any action *brought* by him" against others relating to the *Sea Bear*. (Italics added.) These recitals demonstrate that the circumstances under which the Underwriters would assist Brandwein with any future litigation would *not* be a subject "naturally omitted from the writing." (Rest.2d Contracts, § 216 subd. (2)(b).)

Put another way, because the parties specifically addressed in the settlement the subject of the Underwriters' assistance to Brandwein in connection with litigation brought by him, one would naturally expect them to have explicitly stated that the Underwriters' obligation arose prior to, and not just after, any such litigation being brought, if that in fact was their agreement. This case therefore is distinguishable from others where the parties' written agreement did not touch at all on the subject of the oral agreement. (See *Esbensen*, *supra*, 11 Cal.App.4th at p. 638 [holding employment contract was not fully integrated when the contract was silent on the subject of grounds for termination, and

37

thus evidence that employer orally agreed to renew annual contract so long as plaintiff performed competently should have been admitted].)

Brandwein could have alleged, or otherwise shown, facts explaining why, in this instance, it was "natural" for the parties to have excluded any mention in the settlement agreement of the Underwriters' purported promise to assist Brandwein prior to the filing of this action. (See *Masterson*, *supra*, 68 Cal.2d at p. 228 fn. 1 [suggesting that even if "it would not have been natural for the parties to make the alleged collateral oral agreement, parol evidence of such an agreement should nevertheless be permitted if the court is convinced that the unnatural actually happened in the case being adjudicated"].) However, Brandwein did not allege, and otherwise failed to provide any support for, his proffered explanation—that the Underwriters did not want that promise to appear in writing and thus set a "precedent" for other cases.

Brandwein did allege that it was the Underwriters who insisted upon this being an oral agreement, and also alleged that the agreement itself is evidenced in various letters and e-mails that Brandwein attached to the TAC. But this correspondence does not help him. What these exhibits reveal is Brandwein's persistent requests for documents relating to the Underwriters' investigation, and his counsel's self-serving references to the Underwriters' purported "agreement" to produce them. Prior to execution of the settlement agreement, Brandwein's counsel wrote to the Underwriters' counsel, stating that "in exchange" for making Brandwein available for an interview by the Underwriters to assist in its evaluation of any subrogation claim, Brandwein "*would expect*, *based upon this letter*, that the Underwriters would share the identity of [their salvage] expert and the

content of [the expert's] report." (Italics added.)[16] Later, Brandwein's counsel wrote again to the Underwriters' counsel again, asking "should there be any documents related to" bills from or payments to Western Maritime, "I would appreciate getting a copy of them," and also remarking that Brandwein had produced relevant documents and adding, "I *now request* the same of you." (Italics added.) But none of this correspondence suggests any promise by the Underwriters, as part and parcel of the settlement agreement, to share any reports or other information prior to the filing of any lawsuit, let alone explain why the Underwriters would not expressly include that promise in the settlement agreement that already recites the Underwriters' agreement to assist Brandwein in any litigation actually brought by him.

On this record, we conclude, as a matter of law, that the settlement agreement between the Underwriters and Brandwein was integrated at least on this particular subject. (See Williston, *supra*, § 33.16, p. 622 [recognizing that a writing may be only partially integrated]; accord, *Esbensen*, *supra*, 11 Cal.App.4th at p. 637 [a written agreement may be " 'partially integrated' "].) Accordingly, Brandwein is barred as a matter of law from pleading or proving a breach of contract claim based on the existence of an alleged oral "side agreement" with the Underwriters relating to the same subject, regardless of whether the collateral agreement is consistent or inconsistent with the settlement agreement. (See Williston, *supra*, § 33.26, pp. 704-705 [even if parol agreement is not inherently contradictory of writing, where terms of the writing imply

---

16    In fact, one of the e-mails from the Underwriters' counsel indicates the expert report Brandwein was most eager to obtain was never generated.

that it "fully expresses the whole bargain in regard to the matter in question," evidence of the parol agreement is inadmissible]; Code Civ. Proc., § 1856, subd. (b) [parol evidence may not be offered to explain or supplement, even with additional consistent terms, a writing intended to be "a complete and exclusive statement of the terms of the agreement"].)  The Underwriters' demurrer to the second cause of action properly was sustained.

> b.    Brandwein Failed to State Any Claim Arising from the Underwriters' Alleged Breach of Duty under the "Sue and Labor" Clause of the Policy

In the TAC's third cause of action, Brandwein set forth the so-called "sue and labor" clause of his insurance policy, requiring the Underwriters to pay Brandwein's expenses incurred "to sue, labor and travel for, in and about the defense, safeguard and recovery of the said yacht or any part thereof, without prejudice to this insurance." Brandwein also alleged that the Underwriters had "encouraged" Western Maritime to seek payment directly from Brandwein for any of its expenses.  Based on these allegations, the third cause of action charged that the Underwriters "failed and refused to acknowledge their obligations to Brandwein under the Policy of insurance to the damage and harm of Brandwein."

Even assuming these rather vague allegations are sufficient to allege a breach of agreement, causation and damages, the TAC's third cause of action fails for another reason.  The "sue and labor" claims preserved by the reservation of rights in the settlement agreement are those arising under the Underwriters' "obligations to indemnify and defend against *any claim made against Dr. Brandwein* for the attempted rescue and

40

salvage of the SEA BEAR or any other claim that arose before April 24, 2004, under the POLICY." (Italics added.) Brandwein, however, did not and could not allege that Western Maritime (or anyone else) had made a claim against him, as the trial court observed in sustaining the Underwriters' demurrer to this claim. Brandwein does not dispute this; indeed, he acknowledges that although threatened with suit by Butler, no claim was filed. Furthermore, he makes no argument demonstrating any legal error in the trial court's ruling that, in the absence of any allegation that a claim was made against him, the third cause of action cannot stand. Accordingly, for the stated reasons, we affirm the trial court's dismissal of the TAC's third cause of action.

c.      Brandwein Cannot Plead a Bad Faith Claim as a Matter of Law

In his fourth cause of action, Brandwein charged the Underwriters with acting in bad faith by failing "to acknowledge their obligations" to Brandwein. These obligations included providing "all information to [him] regarding the loss of the *Sea Bear*" and the potential liability of others for that loss; failing "to fulfill their obligation not to purposefully and intentionally refuse to acknowledge that the Policy of insurance . . . provides full coverage to [Brandwein] for any attempt to save or salvage" the yacht; and "failing to agree to pay consistent with all of its obligations under the Policy without requesting further consideration from its assured." We conclude the trial court did not err in dismissing this bad faith claim.

As Brandwein himself acknowledges, the essence of the implied covenant of good faith and fair dealing is that "[t]he insured must refrain from doing anything that will injure the right of the insured to receive *the benefits of the [insurance] agreement,* the

41

terms and conditions of which define the duties and performance to which the insured is entitled."  (2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 240, at p. 355 (Witkin), italics added.)[17]  "The ultimate test of bad faith liability is whether the withholding of policy benefits is unreasonable."  (Witkin., at p. 356.)  Most particularly, for present purposes, "there is no cause of action for breach of the covenant of good faith and fair dealing when no benefits are due."  (*Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 279 (*Progressive West Ins.*); see also *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1151 (*Love*) [the two separate requirements for a breach of the implied covenant are "(1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause."].)

In *Progressive West Ins.*, the appellate court issued a writ vacating the trial court's order overruling the insurer's demurrer.  (*Progressive West Ins.*, *supra*, 135 Cal.App.4th at p. 288.)  It held that the insured did not, and could not, state a bad faith claim where, among other things, the insured acknowledged he had been paid what was due under the

---

17    The parties cite only California law in addressing the propriety of the trial court's dismissal of the Brandwein's bad faith claim, even though they acknowledge that the nature of the Underwriters' duty to act in good faith toward Brandwein is defined by the insurance agreement, and that agreement expressly provides that it is governed by New York law.  Nevertheless, because neither the parties nor the trial court focused on New York law, we will proceed with our analysis, as they did, under California law.  (See *Nagrampa v. MailCoups, Inc*. (9th Cir. 2006) 469 F.3d 1257, 1267 [applying California law because parties, who proceeded on assumption that California law governed, waived Massachusetts choice-of-law provision in agreement]; 13 Williston on Contracts (4th ed. 2000) § 39.27, pp. 620-621 [parties to a contract impliedly waive a term through a course of conduct clearly manifesting an intention to waive the term].)

policy, and did not plead that the insurer either unduly delayed payment or failed to properly investigate his claim.  (*Id*. at p. 279.)  The same is true here.  Brandwein admitted in the TAC that the Underwriters paid him "to the full extent that [the yacht] was insured."  No allegations appear in the TAC suggesting that the Underwriters unreasonably delayed that payment or failed to properly investigate his claim.  Moreover, to the extent that the bad faith claim is based on allegations that the Underwriters acted to deprive Brandwein of the benefits owed him under the "sue and labor" clause of the policy,[18] Brandwein also expressly admitted in the trial court and in his briefs on appeal that he was never sued by Western Maritime for salvage costs, and he alleged in the TAC that the Underwriters paid Western Maritime for those costs, thereby acknowledging that the Underwriters fulfilled its obligations under the "sue and labor" clause.[19]  On this record, no bad faith claim has been or could be stated.  (*Progressive West Ins*., *supra*, 135 Cal.App.4th at p. 278 ["where no benefits are withheld or delayed, there is no cause of

---

[18]    We presume this is the import of Brandwein's rather vague allegations that the Underwriters "failed to fulfill their obligation not to purposefully and intentionally refuse to acknowledge" that the policy fully covered Brandwein for salvage costs, and that it "encouraged" Western Maritime to sue Brandwein directly to recover its costs related to the salvage effort.

[19]    Brandwein's statements and allegations constitute binding admissions.  (See *Setliff v. E.I. Du Pont de Nemours & Co*. (1995) 32 Cal.App.4th 1525, 1534 (*Setliff*) [on demurrer, "[p]laintiff is bound by an admission in his pleadings" and the admission negates any attempt to allege facts to the contrary]; see also *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752 [statements of counsel may be binding admissions]; *Electric Supplies Distributing Co. v. Imperial Hot Mineral Spa* (1981) 122 Cal.App.3d 131, 134 [admissions in brief are binding].)

action for breach of the covenant of good faith and fair dealing"]; accord, *Love*, *supra*, 221 Cal.App.3d at p. 1152.)[20]

To the extent the bad faith claim is based on *post*-settlement conduct (and Brandwein insists it is), it was properly dismissed on demurrer because after the settlement, Brandwein no longer had a contractual relationship with the Underwriters arising from the insurance policy.  As part of the settlement, Brandwein agreed to "tender[] and surrender[] the policy of insurance . . . . "  Contrary to Brandwein's assertion that surrender of a policy is relevant only in a case of "rescission," the policy covering the *Sea Bear* designates "surrender" (defined as delivery of written notice of cancellation) as the means by which Brandwein could cancel his policy.  (See generally Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2011) ¶¶ 5:54-5:69, pp. 5-16 to 5-20 (Croskey) [discussing means by which insured may cancel policy, including surrender].)

The act of physically surrendering the policy is not itself determinative of whether cancellation has occurred.  More important is the intent behind the act.  (Croskey, ¶¶ 5:69-5:70, pp. 5 to 20 [noting that surrender in itself is not enough to effectuate

---

[20]    Brandwein suggests that the Underwriters' payment of both the policy proceeds and the costs of salvage are defenses which may not be taken into account on demurrer. But the court is permitted to base a demurrer ruling on defenses appearing on the face of the complaint, as well as on judicial admissions. (See, e.g., *Lopez v. Southern Cal. Rapid Transit District* (1985) 40 Cal.3d 780, 800 ["Where an affirmative defense appears on the face of the complaint that defense may be raised by a demurrer for failure to state a cause of action."]; *Setliff*, *supra*, 32 Cal.App.4th at p. 1534 [on demurrer, plaintiff is bound by admissions in his pleadings].)

44

cancellation; there must be evidence of intent to cancel].) The terms of the settlement here leave no room for doubt that Brandwein intended cancellation of the policy when he agreed to "surrender[] the policy of insurance . . . relative to any accident or *incident post-dating the subject loss* . . . in full and complete satisfaction of the claim and damages presented herein." (Italics added.) Pursuant to the terms of the policy (which specifies that delivery of *notice* of surrender/cancellation is effective), this form of "surrender" is sufficient to cancel the policy, whether or not a physical tender of the document to the Underwriters was ever effectuated.

Accordingly, after the effective date of the settlement, the only contractual relationship remaining between Brandwein and the Underwriters arose from the settlement agreement itself. At best, Brandwein might have had breach of contract claims arising from any failure by the Underwriters to fulfill their obligations under the settlement agreement, but the facts alleged do not support any such claim. For example, Brandwein purports to base a bad faith claim in part on the Underwriters' alleged failure to produce documents in aid of Brandwein's litigation against Western Maritime. These are the same allegations, however, that give rise to the second cause of action, which we already have concluded fails to state a claim. (See discussion *ante*, Part III.C.2.a.) Merely relabeling this a "bad faith" claim does not make it viable. Similarly, if the Underwriters had not defended Brandwein in an action brought against him by Western Maritime, that might have given rise to a breach of contract action against the

45

Underwriters based on the terms of the settlement. As explained, however, that circumstance never arose.[21]

In these circumstances, the trial court properly determined that Brandwein could not plead a bad faith claim against the Underwriters.

D.   *The Trial Court Properly Struck the Request for Emotional Distress Damages*

Finally, we address Brandwein's argument that the trial court improperly struck his request for emotional distress damages. We do so only because Brandwein sought those damages against Western Maritime, against whom Brandwein obtained a judgment for damages on the negligence claim. Although Brandwein also sought emotional distress damages from the Underwriters and Oversea Brokers, there are no remaining viable claims against those defendants.[22] Accordingly, we consider whether the trial court

---

[21]   To the extent Brandwein bases his bad faith claim on the Underwriters' demand for "further consideration" (i.e., a release) before making payment on the policy, we reject that contention as unsupported by legal argument or authority. (See, e.g., *Cahill*, *supra*, 194 Cal.App.4th at p. 956 [assertions not supported by argument and authority may be deemed waived].) In any event, as the Underwriters note, releases are legally permissible as between insurer and insured. (See 15 Couch on Insurance (3d ed. Dec. 2012 Database Update) § 216.1 [releases are "widely employed in the insurance field," and "may be given by . . . [insureds], releasing claims against insurers"]; see also *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co*. (2010) 50 Cal.4th 913, 931 [recognizing importance of release as a "settlement device"].)

[22]   Specifically, we have affirmed the trial court's judgment dismissing all claims against the Underwriters and dismissing the causes of action against Oversea Brokers for failure to properly advise and make inquiries regarding the yacht's true value. Furthermore, Brandwein has not appealed the jury's verdict in favor of Oversea Brokers on the negligent hiring claim. Although he "conditionally" appealed that latter verdict to the extent the trial court ruled that "gross negligence" was the standard by which Oversea Brokers's conduct was to be measured, we do not reach that issue because we affirm the

46

properly applied federal maritime law and correctly ruled that emotional distress damages arising solely from property loss—like those alleged here—are not cognizable under that law. Brandwein disputes that admiralty jurisdiction, even if properly invoked here, precludes emotional distress damages in this case, and maintains he may seek such damages under California law. We disagree.

In his opening brief, Brandwein concedes (or at least does not dispute) that the trial court properly invoked admiralty jurisdiction in this case. He argues, however, that "[a]dmiralty jurisdiction is just the beginning of the analysis." Brandwein contends that under the savings-to-suitors clause found in title 28 of the United States Code section 1333, the state court has concurrent jurisdiction and may apply its own law as to emotional distress damages because maritime law is inconclusive on that issue.

As a general proposition, Brandwein is correct that invoking admiralty jurisdiction does not mean federal maritime law applies exclusively to all the substantive issues of a case. Federal law gives original and exclusive jurisdiction over admiralty and maritime cases to the federal courts, "saving to suitors in all cases all other remedies to which they are otherwise entitled." (28 U.S.C. § 1333.) The practical effect of this "savings to suitors" clause is to permit plaintiffs in *in personam* actions to "elect to proceed in admiralty or to bring an ordinary civil action, either at law in state court or in a federal district court." (Thomas J. Schoenbaum, 1 Admiralty and Maritime Law (5th ed. Oct. 2012 Database Update) § 4-4 (Schoenbaum).) Even where admiralty jurisdiction has

trial court's judgment in its entirety and, thus, the "condition" for reviewing that question (i.e., reversal as to the Underwriters) does not arise.

been invoked, " '[s]tate law may . . . supplement federal maritime law . . . ; state law may not, however, conflict with federal maritime law, as it would be redefining the requirements or limits of a remedy available at admiralty.' " (*Wells*, *supra*, 186 F.3d at p. 525; see also *Continental Casualty Co. v. Anderson Excavating & Wrecking Co*. (7th Cir. 1999) 189 F.3d 512, 519 [court sitting in admiralty may "borrow the law of a state" if doing so would not negatively impact admiralty's interest in a uniform body of law].) Before applying state law, the court "must ask whether there is admiralty law on the issue and if so it must apply that law . . . ." (*Continental Casualty Co*., at p. 519.)

The problem posed by Brandwein's argument on appeal—that the "existing admiralty jurisprudence regarding emotional distress is neither here nor there" on the question whether emotional distress damages may be awarded based on property loss alone—is that he made no such argument in the trial court, and indeed, conceded the opposite was true. In response to the motions of Western Maritime and Oversea Brokers to strike the emotional distress damages allegations, Brandwein explicitly acknowledged that he did "not challenge holdings of the [] Jones Act cases [cited by defendants] *or the general admiralty rule that physical injury as a result of negligence alone is a prerequisite to proceeding for emotional distress damages*." (Italics added.) He also observed that "California's common  law is *different than general Admiralty Law* as it provides for emotional distress damages for the negligent infliction of emotional distress without physical injury." (Italics added.) At the hearing on defendants' motion to strike, Brandwein's counsel again conceded:  "I didn't challenge that.  Admiralty law does require some physical injury."

48

Thus, rather than focusing on whether or not admiralty law specifically addresses the availability of emotional distress damages in the absence of some physical threat or injury, Brandwein's position in the trial court was that his claims against Western Maritime were strictly common law duress, fraud and negligence claims to which admiralty law did not apply *at all.* His contention with respect to his negligence claim against Western Maritime, in particular, was that the salvager's "negligent acceptance of the [salvage] engagement was complete before [it] touched the SEA BEAR and [its] gross negligence was nearly complete before the SEA BEAR moved an inch." He argued in his trial court brief that "there is no Admiralty jurisdiction and Admiralty Law does not apply" under the standards set forth in *Grubart, Inc. v. Great Lakes Dredge & Dock Co.* (1995) 513 U.S. 527 (cited by the trial court in its order granting the motion to strike) and, accordingly, California's purportedly more generous standard for recovery of emotional distress damages controlled this question.

It is a well established tenet of appellate jurisprudence that a litigant may not pursue one line of legal argument in the trial court, and having failed in that approach, pursue a different, and indeed, contradictory line of argument on appeal, thus depriving the trial court of the opportunity to consider what the appellant contends on appeal is the real dispute. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 8:229, p. 8-155 [theories not raised in trial court generally may not be asserted for the first time on appeal].) Such new arguments may be deemed waived, based on common notions of fairness. "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial

49

court did not have an opportunity to consider. . . .Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." (*JRS Products, Inc. v. Matsushita Elec. Corp. of America* (2004) 115 Cal.App.4th 168, 178.) It is particularly unfair and inappropriate for Brandwein to complain on appeal that the trial court "erred in limiting its analysis . . . to whether admiralty jurisdiction existed," rather than focusing on whether admiralty law precludes the damages requested here, when it was Brandwein himself who led the trial court down that path by focusing his argument on the jurisdictional question *and conceding the very issue he now disputes*.

Although we certainly do not approve of Brandwein's "bait and switch" tactic, we may in our discretion overlook it to reach the legal issue presented on appeal. (Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8.243, pp. 8-160-160.1 [appellate court may consider new contentions on appeal in its discretion].) We do so here, and conclude the trial court correctly struck Brandwein's request for emotional distress damages. We do not review the court's invocation of admiralty jurisdiction on this issue because Brandwein has not challenged it on appeal. We reject Brandwein's assertion, however, that maritime law is "far from well settled" regarding the availability of emotional distress damages based on property loss alone. On the contrary, the case law is clear that admiralty law recognizes a right to recover emotional distress damages for negligent conduct only in limited circumstances. Thus, in *Chan v. Society Expeditions, Inc.* (9th Cir. 1994) 39 F.3d 1398, the Ninth Circuit explained, such damages may be recovered if (1) the defendant's conduct caused a physical injury from

50

which the damages flowed; (2) plaintiff witnessed physical harm or peril to another and was endangered himself by defendant's conduct, or was endangered by an incident he did not witness; or (3) he personally observed and was in close proximity to an accident that caused severe injury or death to a close family member. (*Id*. at p. 1409.) In short, admiralty law does not recognize a right to recover emotional distress damages for negligent conduct that results merely from witnessing an accident or the loss of property. (See Schoenbaum, § 5-16 [plaintiff must have sustained a physical impact or have been placed in immediate risk of physical harm].)

Brandwein made no argument, either in the trial court or on appeal, that any of these tests is satisfied in this case. His argument that *Chan* and the other cases cited in his brief are inapposite because they involve causes of action for the negligent or intentional infliction of emotional distress, rather than merely a request for emotional distress damages arising from a negligence claim, is entirely baseless. Brandwein identifies no substantive legal difference between the two. In fact, California does not recognize an independent tort for the negligent infliction of emotional distress. Instead, recovery of emotional distress damages is premised on defendant's negligence (i.e., breach of a duty) that proximately causes emotional distress. (See, e.g., *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984; *Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 204.) That is precisely what Brandwein alleged in the TAC.

In sum, the trial court properly concluded that it could not "supplement" the foregoing settled case law with California law, to the extent it permits recovery of

51

emotional distress damages based on property loss alone (as Brandwein contends it does), because doing so would "conflict[] with admiralty's goal of uniformity."  (See, e.g., *Wells*, *supra*, 186 F.3d at p. 525 ["State law is said to conflict with general maritime law when it negatively impacts on admiralty's foremost goal—uniformity"].)  Brandwein's request for emotional distress damages was properly stricken.

## DISPOSITION

The judgment is affirmed.  Respondents may recover their costs on appeal.


                                                                    O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.

Filed 8/23/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HOWARD J. BRANDWEIN, Individually and as Trustee etc., et al., <br><br>　　Plaintiffs and Appellants, <br><br>　　v. <br><br>ROBERT BUTLER et al., <br><br>　　Defendants and Respondents. | D059413 <br><br><br>(Super. Ct. No. 37-2008-00090249-CU-CO-CTL) <br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion filed August 9, 2013, is ordered certified for publication.

BENKE, Acting P. J.

Copies to: All parties

53